PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 18-2743
_____

NORTHEASTERN PENNSYLVANIA
FREETHOUGHT SOCIETY,

                                    Appellant

v.

COUNTY OF LACKAWANNA TRANSIT SYSTEM
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3-15-cv-00833)
District Judge: Hon. Malachy E. Mannion
_____

Argued June 12, 2019
Before: HARDIMAN, PORTER, and COWEN, *Circuit Judges*.

(Filed: September 17, 2019)

Molly M. Tack-Hooper [Argued]
American Civil Liberties Union of Pennsylvania
P.O. Box 60173
Philadelphia, PA 19106

Brian Hauss
American Civil Liberties Union Foundation
125 Broad Street
18th Floor
New York, NY  10004


Theresa E. Loscalzo
Stephen J. Shapiro
Schnader Harrison Segal & Lewis LLP
1600 Market Street
Suite 3600
Philadelphia, PA 19103

Rachel A.H. Horton
DLA Piper
1650 Market Street
One Liberty Place
Suite 5000
Philadelphia, PA  19103

Benjamin D. Wanger
Mullen Coughlin
1275 Drummers Lane
Suite 302
Wayne, PA  19087


        *Attorneys for Appellant Northeastern Pennsylvania*
*Freethought Society*

Thomas A. Specht [Argued]
Marshall Dennehey Warner Coleman & Goggin

P.O. Box 3118
Scranton, PA 18505

*Attorney for Appellee County of Lackawanna Transit System*

Bruce D. Brown
The Reporters Committee for Freedom of the Press
1156 15th Street, N.W.
Suite 1020
Washington, DC 20005

*Attorney for Amicus Reporters Committee for Freedom of the Press in Support of Appellant*

Geoffrey Blackwell
American Atheists Legal Center
718 7th Street, N.W.
Washington, DC 20001

*Attorney for Amicus Curiae American Atheists and Center for Inquiry*

———————

OPINION OF THE COURT

———————

HARDIMAN, *Circuit Judge*.

This appeal arises under the First Amendment to the United States Constitution. Appellant Northeastern Pennsylvania Freethought Society (Freethought) would like to advertise on public buses in Lackawanna County,

3

Pennsylvania. Freethought proposed an ad displaying the word "Atheists" along with the group's name and website. The County of Lackawanna Transit System (COLTS) rejected the ad under its policy which excludes religious and atheistic messages. Because that policy discriminates based on viewpoint, we hold that it violates the First Amendment.

I

COLTS provides public bus service in Lackawanna County. Because its ticket revenue is negligible, COLTS is funded almost exclusively by the Pennsylvania Department of Transportation, Lackawanna County, and the federal government. COLTS leases advertising space on the inside and outside of its buses, but the revenue that generates makes up less than two percent of COLTS's budget.

Freethought is an association of atheists, agnostics, secularists, and skeptics. Its goals are to build a community for likeminded people, to organize social and educational events, and through these events and other activism to "promot[e] critical thinking and uphold[] the separation of church and state." App. 140. Freethought advocates its view of proper church-state separation by filing complaints and protesting public religious displays.

In 2012, Freethought organizer and spokesman Justin Vacula was a student at Marywood University in Scranton. One day during his commute to campus, Vacula noticed a "God Bless America" message on the outside of a COLTS bus. The message—which scrolled across the bus's digital route-information display when enabled by the driver—was added by the manufacturer after the terrorist attacks of September 11, 2001. Vacula complained and COLTS removed the message

4

from its software. This upset some drivers, including one who defiantly displayed a "God Bless America" magnet on the inside of his bus. Vacula complained again, and COLTS made the driver remove it.

Because of these expressions of religious sentiment, Freethought proposed to run a "response" advertisement to "challenge a potential church/state violation and test COLTS'[s] advertising policy." App. 1553. The proposed ad simply read "Atheists," and included Freethought's web address, superimposed on a blue sky with clouds. Vacula said the ad was meant to show local religious believers that there are atheists in the community and to provide a resource for those believers to learn about Freethought. The ad would also tell other nonbelievers in the region that they are "not alone" and that "a local organization for atheists exists." App. 1553.

Freethought submitted its proposal in January 2012, but COLTS rejected the ad. Communications director Gretchen Wintermantel decided Freethought "wanted to advertise so that they could spark a debate on our buses." App. 1098. And the word "atheists" (or, for that matter, the words "Jews" or "Muslims") might do just that. App. 1099. In rejecting Freethought's proposal, COLTS relied on a policy it had adopted in 2011 that banned ads for tobacco products, alcohol, firearms, and political candidates. App. 686. It also banned ads that in COLTS's "sole discretion" are "derogatory" to racial, religious, and other specified groups. *Id.* It even prohibited ads that are "objectionable, controversial[,] or would generally be offensive to COLTS'[s] ridership." *Id.*

Before 2011 COLTS had no policy—though it reserved in its contracts the right to reject "objectionable or controversial" ads. *E.g.*, App. 340. It never exercised that right

5

until Wintermantel and her boss rejected an ad warning that "Judgment Day" was approaching. App. 56–57, 1051. They did so even though COLTS had routinely run religious ads in the past with no problem. That included ads for churches, the Office of Catholic Schools, and the evangelist Beverly Benton—who promised a "Saturday night miracle service" at a convention she headlined. App. 477. There is no evidence of record that those ads or any others had elicited a passenger complaint. Partisan political ads, gambling ads, and ads for alcoholic beverages all ran without incident. Even an ad for a virulently racist and anti-Semitic website was permitted without apparent complaint. COLTS nevertheless rejected the "Judgment Day" ad, believing its religious character could rile up passengers.

The "Judgment Day" experience convinced Wintermantel it was time to implement a formal policy. She began researching other transit systems' policies and identified controversies in other cities kindled by inflammatory ad campaigns. She reviewed a *New York Times* article about an atheist ad campaign in Fort Worth, which had drawn competing religious ads and a pastor-led boycott. The article also noted that atheist bus ads and billboards had been vandalized in Detroit, Tampa Bay, and Sacramento. In Cincinnati, the *Times* reported, a landlord took an atheist ad down after receiving threats. If all that could happen, Wintermantel thought, similar ads could upset COLTS riders and cause disturbances on its buses. So she drafted the 2011 policy and the COLTS board approved it.

COLTS rejected Freethought's first "Atheists" ad proposal in 2012 and a similar one in 2013. These rejections were based on the 2011 policy's vaguest provision. COLTS had decided, in its "sole discretion," that the "Atheists" ad would

be controversial. The first rejection was by phone, but the second came by letter which stated:

> COLTS does not accept advertisements that promote the belief that "there is no God" or advertisements that promote the belief that "there is a God" . . . . The existence or nonexistence of a supreme deity is a public issue. COLTS believes that your proposed advertisement may offend or alienate a segment of its ridership and thus negatively affect its revenue. COLTS does not wish to become embroiled in a debate over your group's viewpoints.

App. 701.

About a week later, COLTS enacted a new policy to "clarify" the 2011 policy. App. 59–60. This 2013 policy is still in effect. It announced that COLTS opened its ad space "for the sole purpose of generating revenue for COLTS while at the same time maintaining or increasing its ridership." App. 687. Besides banning many of the same ads as the 2011 policy (including "disparaging" ads and ads for firearms, alcohol, and tobacco), the 2013 policy featured new prohibitions on religious and political messages. COLTS reasoned that many have strong feelings about religion and politics, so excluding those messages would help keep the peace. The religion provision barred ads:

> that promote the existence or non-existence of a supreme deity, deities, being or beings; that address, promote, criticize or attack a religion or religions, religious beliefs or lack of religious

beliefs; that directly quote or cite scriptures, religious text or texts involving religious beliefs or lack of religious beliefs; or [that] are otherwise religious in nature.

App. 687–88. The politics provision barred partisan and electioneering ads, and ads that "involv[e] an issue reasonably deemed by COLTS to be political in nature in that it directly or indirectly implicates the action, inaction, prospective action, or policies of a governmental entity." App. 687.

When Freethought proposed a third "Atheists" ad, COLTS rejected it under the 2013 policy's religious speech prohibition. COLTS reiterated its position that the "existence or non-existence of a supreme deity is a public issue." App. 704. "It is COLTS'[s] goal to provide a safe and welcoming environment on its buses for the public at large," the rejection letter explained, and "[t]he acceptance of ads that promote debate over public issues such as abortion, gun control or the existence of God in a confined space like the inside of a bus detracts from this goal." *Id.*

Eventually, Freethought proposed an ad that dropped the word "Atheists" and simply listed its name and web address. Wintermantel consulted COLTS's attorney, who thought it was a borderline case under the 2013 policy. "[Vacula] is being tricky," the lawyer opined, but he conceded the ad might not violate COLTS's religious or political speech prohibitions, so they needed to research the matter. App. 1528. COLTS ultimately accepted the ad. But Freethought would still like to run its thrice-rejected "Atheists" ad, which "more clearly explain[s] who its members are." Freethought Br. 19. So it sued under 42 U.S.C. § 1983.

## II

Freethought challenged COLTS's 2013 policy, seeking a declaratory judgment and a permanent injunction forbidding COLTS from enforcing the policy. The District Court ruled for COLTS after a one-day bench trial. The Court held COLTS's policy viewpoint neutral, reasoning that the religious speech prohibition put the entire subject of religion out of bounds. It also deemed COLTS's ad space a limited public forum, even though it had probably once been a designated public forum. The Court grounded that conclusion in COLTS's statement of intent "not to become a public forum" and its "practice of permitting only limited access to the advertising spaces on its buses." *Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys.*, 327 F. Supp. 3d 767, 779–80 (M.D. Pa. 2018). Holding Freethought's "Atheists" ad outside the forum's bounds, the Court turned to whether that restriction was reasonable.

The ad space was first opened, the Court found, to raise revenue. With its 2013 policy, COLTS added the purpose of "maintaining or increasing COLTS'[s] ridership." *Id.* at 781. The Court held the policy's restrictions were reasonably connected to those goals. First, the policy was intended to "keep COLTS neutral on matters of public concern," which the Court said is "an especially strong interest supporting the reasonableness in limiting speech." *Id.* at 782. Second, the Court held the policy was reasonably connected to rider safety, since threats to rider safety also threaten revenue and ridership. "Given the decrease in civil tolerance and the increase in social unrest and violence in today's society," the Court explained, allowing ads like Freethought's might provoke "a controversial discussion" which could "potentially lead to a dangerous situation for both passengers and drivers." *Id.* at 782–83.

9

Finally, the Court held the 2013 policy was not unconstitutionally vague because "a person of ordinary intelligence can generally tell what types of advertisements are permitted or proscribed." *Id.* at 784.

Freethought filed this timely appeal.

III

The District Court had jurisdiction over Freethought's First Amendment claim under 28 U.S.C. § 1331. We have jurisdiction over this appeal under 28 U.S.C. § 1291. Where, as here, "the speaker unsuccessfully claimed a violation of free speech rights in the trial court," *Pittsburgh League of Young Voters Educ. Fund v. Port Auth. of Allegheny Cty.*, 653 F.3d 290, 295 (3d Cir. 2011), we conduct an independent review of the record. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 499 (1984).

IV

We approach this case as a facial challenge to COLTS's prohibition of religious speech. The First Amendment doctrine underlying Freethought's challenge leads ineluctably to facial invalidity—so we need not "pause to consider whether [the provision] might admit some permissible applications." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019); *see Citizens United v. FEC*, 558 U.S. 310, 331 (2010) ("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge."). If the religious speech prohibition as written "'aim[s] at the suppression of' views," *Brunetti*, 139 S. Ct. at 2302 (quoting *Matal v. Tam*, 137 S. Ct. 1744, 1767

(2017) (Kennedy, J., concurring in part and concurring in the judgment)), it is invalid, *see id.* If instead it's an impermissible content based restriction, that too leads to facial invalidity. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885, 1888 (2018); *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 123 (1991) (holding statute "not narrowly tailored to advance [the government's] objective" and so "inconsistent with the First Amendment"); *Ward v. Rock Against Racism*, 491 U.S. 781, 801 (1989) ("[T]he validity of the regulation depends on the relation it bears to the overall problem the government seeks to correct, not on the extent to which it furthers the government's interests in an individual case."). In either case COLTS "violate[d] the Constitution when it passed the [policy]," *Diop v. ICE/Homeland Sec.*, 656 F.3d 221, 232 n.10 (3d Cir. 2011).

V

Government actors like COLTS cannot restrict speech because they "disapprov[e] of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Yet not every public space is Hyde Park, so a government may sometimes impose content or speaker limitations that protect the use of its property. *See Mansky*, 138 S. Ct. at 1885. But no matter what kind of property is at issue, viewpoint discrimination is out of bounds.

Viewpoint discrimination is an "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995). Rather than aiming at an entire subject, it "targets . . . particular views taken by speakers." *Id.* And that violates the First Amendment's most basic promise. *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) (collecting cases). It empowers the censor to deprive the citizen

11

of the opportunity to persuade. So in any forum, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829; *see Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 111–12 (2001).

Distinguishing subject matter from viewpoint can be difficult. *Rosenberger*, 515 U.S. at 830–31. Fortunately, "our task here is greatly simplified by a trilogy of Supreme Court decisions each addressing blanket bans on religious messages and each concluding that such bans constitute impermissible viewpoint discrimination." *Byrne v. Rutledge*, 623 F.3d 46, 55 (2d Cir. 2010). Those cases—*Rosenberger*, *Lamb's Chapel*, and *Good News Club*—govern this one.

In *Rosenberger*, the University of Virginia withheld subsidies from student groups whose activities "primarily promote[d] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." 515 U.S. at 825. An undergraduate group that published Wide Awake, a "magazine of philosophical and religious expression," challenged that policy. *Id.* at 825–26. Wide Awake was founded to "facilitate discussion which fosters an atmosphere of sensitivity to and tolerance of Christian viewpoints," and "to provide a unifying focus for Christians of multicultural backgrounds." *Id.* (citation and alterations omitted). To that end, its writers opined from a Christian perspective on issues like racism, pregnancy, and student stress. *Id.* at 826.

The Court held the University had restricted viewpoint, not subject matter. "Religion may be a vast area of inquiry," the Court reasoned, "but it also provides, as it did here, a specific premise, a perspective, a standpoint from which a

12

variety of subjects may be discussed and considered." *Id.* at 831. The policy was viewpoint based because it "select[ed] for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* Student news groups could write on racism, or stress, or pregnancy—but not if their faith informed the message.

The *Rosenberger* dissent argued that the restriction was based on subject matter, not viewpoint, because it applied to all religions and "agnostics and atheists as well." *See Rosenberger*, 515 U.S. at 895–96 (Souter, J., dissenting). COLTS makes a similar argument here. But as the Court explained in *Rosenberger*, that argument "reflects an insupportable assumption that all debate is bipolar and that antireligious speech is the only response to religious speech." *Id.* at 831. Within a given subject, "[i]t is as objectionable to exclude both a theistic and an atheistic perspective on the debate as it is to exclude one, the other, or yet another political, economic, or social viewpoint." *Id.*; *see Brunetti*, 139 S. Ct. at 2299.

To reach its holding, the *Rosenberger* Court relied mainly on *Lamb's Chapel*. In that case, the Supreme Court invalidated a ban on the use of public-school property for "religious purposes" that had stymied a group's efforts to screen religious lectures on family issues and child rearing. *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 393 (1993). As in *Rosenberger*, it did not matter "[t]hat all religions and all uses for religious purposes are treated alike" because the lectures—though avowedly religious—discussed topics the policy otherwise permitted. *Id.*

In short, *Rosenberger* "clarified the distinction between content-based and viewpoint discrimination and adopted a

13

broad construction of the latter, providing greater protection to private religious speech on public property." *Summum v. Callaghan*, 130 F.3d 906, 917 (10th Cir. 1997).[1] The Court provided yet more clarity in *Good News Club*. It granted certiorari in that case to resolve "a conflict among the Courts of Appeals on the question whether speech can be excluded from a limited public forum on the basis of the religious nature of the speech." 533 U.S. at 105. As in *Lamb's Chapel* and *Rosenberger*, the Court answered "no."

The Court held it was viewpoint discrimination to bar the use for religious purposes of a space otherwise available for "instruction in any branch of education, learning or the arts" and for "social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community." *Id.* at 102. The Good News Club, which wanted to offer after-school religious instruction, must have equal access to a forum that allowed others to speak on morals and character development. *Id.* at 108–09. If a forum is open to

---

[1] In arguing for a narrower construction of viewpoint, our dissenting colleague claims our holding will deter governments from creating forums for speech. Dissenting Op. 8–9. That concern is relevant to deciding whether a government has opened a forum (and what kind of forum). *See Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680–83 (1998). But it cannot bear on the viewpoint discrimination analysis because courts should not nurture forums that "silence dissent and distort the marketplace of ideas," *Tam*, 137 S. Ct. at 1766 (Kennedy, J., concurring in part and concurring in the judgment).

teaching morals through Aesop's Fables, it must be open to religious moral instruction too. *Id.*

*Good News Club* also foreclosed the argument that a broad prohibition on religious speech can validate religious viewpoint discrimination. *Rosenberger* noted in dicta that the university's policy did not prohibit religion as a subject matter. 515 U.S. at 831. That comment might have been read to suggest a broader policy could bar religious perspectives on otherwise allowable topics—so long as the prohibition was phrased to "exclude religion as a subject matter." *Good News Club* rejected that proposition and disclaimed any reliance on this dictum. *See* 533 U.S. at 110–11. The Good News Club's "quintessentially religious" activities, *id.* at 111, could not be excluded even though the policy broadly forbade use of the forum "for religious purposes," *id.* at 103.

Our Court reinforced *Good News Club*'s understanding of *Rosenberger* in *Child Evangelism Fellowship of New Jersey Inc. v. Stafford Township School District*, 386 F.3d 514 (3d Cir. 2004). That case involved limitations on access to facilities and back-to-school nights. *Id.* at 519. Some community groups were pre-approved for access, while others could be added at the school district's discretion. *Id.* As for the content allowed, the policy required advance approval by the district and a nexus to the students or school. *Id.* at 520. It forbade partisan and for-profit messages as well as solicitations. *Id.* The district allowed Child Evangelism to host meetings like those in *Good News Club*, but denied it permission to distribute its flyers, permission slips, and Bibles. *Id.* at 523. Rejecting the district's purportedly viewpoint neutral rationales as "either incoherent or euphemisms for viewpoint-based religious discrimination," *id.* at 527, we underscored what was already clear after *Good News Club*. Whether or not a government claims to have

15

excluded "religion as a subject or category of speech," "if government permits the discussion of a topic from a secular perspective, it may not shut out speech that discusses the same topic from a religious perspective." *Id.* at 528; *see Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 226 (3d Cir. 2003).

The same is true in this case. "Whatever its stated intent, [COLTS's] ban on religious messages in practice operates not to restrict speech to certain subjects but instead to distinguish between those who seek to express secular and religious views *on the same subjects.*" *Byrne*, 623 F.3d at 56–57; *see Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).

By the terms of the 2013 policy and as shown by COLTS's permissive practice, the forum is open to messages on all topics not expressly banned. As the Seventh Circuit explained, "[t]he absence of an explicit list of permissible subjects upon which discourse is permissible in [a] nonpublic forum does not mean that there is no 'otherwise includible subject' for discussion in the forum . . . . [such] policies impliedly allow[] the distribution of all other written material . . . ." *Grossbaum v. Indianapolis-Marion Cty. Bldg. Auth.*, 63 F.3d 581, 590 (7th Cir. 1995). We thus disagree with the dissent's argument that the viewpoint analysis in *Rosenberger*, *Lamb's Chapel*, and *Good News Club* can be distinguished by the fact those cases involved "prospectively defined, permissible subject matter." Dissenting Op. 6 (quoting *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 338 (D.C. Cir. 2018) (Wilkins, J., concurring)).

As Vacula explained in 2012, the "Atheists" ad was meant to communicate to believers and atheists alike that "a

16

local organization for atheists exists," and to atheists in particular that they are "not alone." App. 1553. The ad, though minimalistic, reasonably communicates those messages. Nothing in the record suggests COLTS's policy would prohibit secular associations from advertising their organizational philosophy or from communicating the message: "We exist, this is who we are, consider learning about or joining us." *See Lamb's Chapel*, 508 U.S. at 393. But atheistic and religious associations are banned from saying the same thing because of the character of their speech.

Similarly, a healthcare provider may tout its services—so long as it doesn't disclose that those services are (or once were) part of a religious tradition. Geisinger Health System is in; Lutheran Home Care & Hospice is out. And the Diocese of Scranton may run an ad encouraging the public to "Consider Adoption"—provided it doesn't say why.

It's true that Freethought's "Atheists" ad relates to the "subject" of religion writ large. But at its core, its message is one of organizational existence, identity, and outreach. Even if that speech "is quintessentially religious' or 'decidedly religious in nature,'" *Good News Club*, 533 U.S. at 111, it may still "constitute a separate viewpoint on a wide variety of *seemingly* secular subject matter," *Good News/Good Sports Club v. Sch. Dist. of City of Ladue*, 28 F.3d 1501, 1507 (8th Cir. 1994). What matters for the viewpoint discrimination inquiry isn't how religious a message is, but whether it communicates a religious (or atheistic) viewpoint on a subject to which the forum is otherwise open.

This point is well-illustrated by a Second Circuit case which invalidated a Vermont law prohibiting deity names and other religious references on license plates. *Byrne v. Rutledge*,

17

623 F.3d at 49–50. The motorist in *Byrne* wanted his plate to say JN36TN—a reference to the oft-quoted biblical passage John 3:16. The court explained this reference spoke to several possible topics, all of which were open to secular speech. Whether the plate was "intended . . . as a statement of personal belief or philosophy or simply as a statement of self-identity as a Christian or affiliation with the Christian church . . . . The critical fact is that Vermont permits" the use of its forum "for comment on *all* of these subjects, so long as the comment is from a secular perspective." *Id.* at 57. In the same way, COLTS prohibits Freethought's statement of organizational identity just because of that statement's atheistic character. For that reason, we hold that the 2013 policy facially discriminates against atheistic and religious viewpoints on all of the many topics permitted in the forum.

We recognize that this holding diverges from a recent decision of the United States Court of Appeals for the D.C. Circuit, *Archdiocese of Washington v. Washington Metropolitan Area Transit Authority*, 897 F.3d 314 (D.C. Cir. 2018), *petition for cert. filed*, No. 18-1455 (May 20, 2019). The court there reasoned that because WMATA prohibited messages on many subjects, it had not "invite[d] . . . debate on religion." *Id.* at 327. That narrower forum, the court held, authorized the transit agency's ban on "[a]dvertisements that promote or oppose any religion, religious practice or belief" despite the rule announced in *Rosenberger*, *Lamb's Chapel*, and *Good News Club*. *Id.* at 318–19. WMATA's policy isn't the same as COLTS's, *see Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 281 F. Supp. 3d 88, 96 (D.D.C. 2017), and the facts of the cases are different. But we respectfully disagree with our sister court.

18

The Archdiocese of Washington proposed an evangelistic ad to run on the exterior of WMATA's buses. The ad depicted "a starry night and the silhouettes of three shepherds and sheep on a hill facing a bright shining star high in the sky, along with the words 'Find the Perfect Gift.'" *Archdiocese of Wash.*, 897 F.3d at 320. It also included a web address and social media hashtag. *Id.* WMATA rejected the ad under the religious speech prohibition described above. The D.C. Circuit held WMATA's policy regulated content, not viewpoint. *Id.* at 325. To make that determination, the court thought it needed to conduct a forum analysis. *Id.* at 321–24. Then, emphasizing the narrowness of the forum, the court held WMATA's policy permissibly excluded "religion as a subject matter." *Id.* at 327 (quoting *Rosenberger*, 515 U.S. at 831). Finally, the court rejected the Archdiocese's arguments that the topics it wanted to address were open to secular speakers. *Id.* at 329.

Our disagreement starts at the beginning—with the D.C. Circuit's choice to conduct a forum analysis before determining whether the policy discriminated on the basis of viewpoint. That put the cart before the horse because the type of forum sheds no light on whether a policy or decision discriminates against a certain viewpoint. And viewpoint discrimination is impermissible in any forum. *Mansky*, 138 S. Ct. at 1885; *Tam*, 137 S. Ct. at 1763 (plurality opinion); *Good News Club*, 533 U.S. at 111–12; *Rosenberger*, 515 U.S. at 829. Courts "need not tackle the forum-selection question" since "[r]egardless of whether the advertising space is a public or nonpublic forum, the [speaker] is entitled to relief" if it establishes viewpoint discrimination. *Pittsburgh League*, 653 F.3d at 296; *see Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118*, 9 F.3d 1295, 1298 (7th Cir. 1993) ("The [F]irst

19

[A]mendment's ban on discriminating against religious speech does not depend on whether the school is a 'public forum' and, if so, what kind . . . ."). So *Lamb's Chapel*, *Rosenberger*, and *Good News Club* cannot be distinguished by reasoning that those forums were open to a "wide[r] range of subjects," *Archdiocese of Wash.*, 897 F.3d at 327. What matters is whether the range of subjects—narrow, wide, or in-between—includes the one the speaker wants to address. *See Air Line Pilots Ass'n, Int'l v. Dep't of Aviation of City of Chi.*, 45 F.3d 1144, 1159 (7th Cir. 1995) ("It may be that an entire category of speech is banned, but this hardly satisfies a viewpoint inquiry.").

The D.C. Circuit was also concerned that "[t]he Archdiocese's position would eliminate the government's prerogative to exclude religion as a subject matter in any non-public forum." *Id.* at 325. But that "prerogative" is based on a dictum in *Rosenberger* that the Supreme Court has since disclaimed. *Good News Club*, 533 U.S. at 110. And it echoes the protestations of the *Rosenberger* dissent, not the reasoning of the majority. *See Rosenberger*, 515 U.S. at 898 (Souter, J., dissenting) ("If this amounts to viewpoint discrimination, the Court has all but eviscerated the line between viewpoint and content."). In any case, no prerogative to ban subjects can justify viewpoint discrimination.

Perhaps a forum could be defined so narrowly that religious perspectives would be non-germane. But the COLTS ad space is not such a forum. And we doubt whether a forum like COLTS's—defined by its exclusions and otherwise open, rather than defined by its beneficiaries and otherwise closed— could ever fit the bill. *See Cornelius*, 473 U.S. at 806 ("[A] speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum or if he is not a member of the class of speakers for

20

whose especial benefit the forum was created," but "the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject." (citations omitted)). That COLTS has tied those exclusions to speech it considers "controversial" only compounds the problem. *See Child Evangelism*, 386 F.3d at 527 ("A group is controversial or divisive because some take issue with its viewpoint.").

It makes sense that it would be difficult, if not impossible, to exclude religion "as a subject matter" in a forum open to topics susceptible to a religious perspective. After all, a typical "subject" is not "a comprehensive body of thought" from which "a variety of subjects may be discussed and considered," *Rosenberger*, 515 U.S. at 831. *Compare Choose Life Ill., Inc. v. White*, 547 F.3d 853, 865 (7th Cir. 2008) (finding viewpoint neutrality because the government "excluded the entire subject of abortion from its specialty-plate program"), *with Byrne*, 623 F.3d at 57 (holding blanket ban on "religious" vanity plates cannot justify excluding religious expression of self-identity when secular expression is allowed). That's why we must "broad[ly] constru[e] [viewpoint discrimination], providing greater protection to private religious speech on public property." *Summum*, 130 F.3d at 917.

Religion is not only a subject. It's a worldview through which believers see countless issues. It was so for our Nation's founders, whose moral thesis changed the world and conceived a new birth of freedom in the United States: "that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." The Declaration of Independence para. 2 (U.S. 1776). Is there room for our

21

revolutionary creed on a COLTS bus? Apparently not. As COLTS's counsel admitted at oral argument, the word "Creator" would be a problem.

Finally, to the extent the D.C. Circuit reasoned that religious speech on a permissible topic may be censored if it is not "primarily" about that topic, *see Archdiocese of Wash.*, 897 F.3d at 329, we disagree with that too. As the Supreme Court explained in *Good News Club*, that a message on a permitted topic is "quintessentially religious" or "decidedly religious in nature" does not relegate it to second-class status. *See* 533 U.S. at 111.

## VI

Even if COLTS's ban on religious speech were viewpoint neutral, it would still need to survive scrutiny as a content based restriction. That means, at a minimum, it must be reasonable "in the light of the purpose of the forum and all the surrounding circumstances." *Cornelius*, 473 U.S. at 809.[2]

---

[2] If COLTS's ad space were a designated public forum, as Freethought urges, strict scrutiny would apply. We need not decide what kind of forum the ad space is, because the religious speech ban fails even if the space is a limited or nonpublic forum. But we doubt COLTS has successfully closed its forum to Freethought's speech.

COLTS opened its ad space as a designated public forum. From when it began selling ads until the "Judgment Day" proposal, COLTS never rejected a single ad. It ran

22

religious, political, and commercial ads during that time. *See Christ's Bride Ministries, Inc. v. Se. Pa. Transp. Auth.*, 148 F.3d 242, 250–52 (3d Cir. 1998)*.* So its forum was open to Freethought's atheistic message. *See id*.

And while COLTS may limit or close the forum at any time, *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986), it cannot do so in an improper manner. *See The Koala v. Khosla*, __F.3d__, 2019 WL 3311148, at *12 (9th Cir. July 24, 2019); *Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 77 (1st Cir. 2004).

We doubt the 2013 policy closed the forum. First, its central prohibition—on political speech—includes a tangle of double negatives that is vague enough to ensnare nearly any message. It bans "advertisements involving an issue reasonably deemed by COLTS to be political in nature in that it directly *or indirectly* implicates the action, *inaction*, prospective action, or policies of a governmental entity." App. 687 (emphases added). That does not provide a sufficiently definite standard for COLTS to exercise discretion. *See Mansky*, 138 S. Ct. at 1891. And second, the "expressive use [of COLTS's ad space] has not interfered with providing [bus service] to the public." *Christ's Bride*, 148 F.3d at 250. That suggests its new restrictions are not "truly part of 'the process of limiting a nonpublic forum to activities compatible with the intended purpose of the property,'" *United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 351–52 (6th Cir. 1998) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983)).

23

This standard does not demand "the most reasonable or the only reasonable limitation," so "a finding of strict incompatibility between the nature of the speech or the identity of the speaker and the functioning of the nonpublic forum is not mandated." *Cornelius*, 473 U.S. at 808. Still, our review is more exacting than the deferential rational basis standard. *NAACP v. City of Philadelphia*, 834 F.3d 435, 442–43 (3d Cir. 2016). COLTS bears the burden of showing its restrictions are reasonable. *Id.* at 443.

COLTS opened its advertising space to raise revenue. The 2013 policy states COLTS will sell ads for the "sole purpose of generating revenue for COLTS while at the same time maintaining or increasing its ridership." App. 687. Freethought argues we should disregard those latter interests—maintaining or increasing ridership—because COLTS stipulated that they were not goals when it first opened its ad space and when it enacted the 2011 policy. But we assess both the speech forum and the broader government property of which it is part. *See Cornelius*, 473 U.S. at 801–02. An advertising program that deters all or many riders is inconsistent with the purpose of a public bus. *See NAACP*, 834 F.3d at 445–46 (holding commonsense inferences can support explanation of forum's purpose). There's no indication COLTS wanted to transform its buses from public transit to rolling billboards. So we assess reasonableness given both goals: ad revenue and ridership.

Does the religious speech ban reasonably pursue those goals? Freethought says suppressing controversial speech is inherently illegitimate. But this confuses means and ends. A policy that on its face singled out "controversial" or "offensive" messages would indeed be viewpoint discriminatory. *See Brunetti*, 139 S. Ct. at 2299–2300. But

24

unlike the 2011 policy, the 2013 policy does not do that. "The First Amendment does not forbid a viewpoint-neutral exclusion of speakers who would disrupt a nonpublic forum and hinder its effectiveness for its intended purpose." *Cornelius*, 473 U.S. at 811; *see Lehman v. City of Shaker Heights*, 418 U.S. 298, 304 (1974) (plurality opinion). COLTS's goal is not to squelch controversial speech for its own sake, but to avoid disruption by excluding categories of speech it believes likely to inflame passions.

While that may be a permissible goal sometimes, it should be viewed with suspicion for several reasons. It conflicts with the core purposes of the First Amendment. *See, e.g.*, *Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views."); *Simon & Schuster*, 502 U.S. at 118; *Abrams v. United States*, 250 U.S. 616, 630 (1919) (Holmes, J., dissenting) ("[W]e should be eternally vigilant against attempts to check the expression of opinions that we loathe and believe to be fraught with death."). It invites a heckler's veto by signaling that the government will suppress unpopular speech if the public behaves badly. *See Seattle Mideast Awareness Campaign v. King County*, 781 F.3d 489, 504 (9th Cir. 2015) (Christen, J., dissenting). And it's hard for officials to apply these standards objectively—and harder still for courts to assess whether they have done so. *See NAACP*, 834 F.3d at 446. We proceed with those cautionary principles in mind.

COLTS argues that heated debates on its buses could deter riders and escalate to the point of distracting the driver, endangering passengers, and reducing revenue. But since rational basis review doesn't apply here, we should not conjure

25

any "conceivable state of facts," *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), that could support COLTS's action. True, COLTS cited disruptions on other transit systems in formulating its policy—disruptions that led to anonymous threats against buses, as well as boycotts and vandalism. While threats, boycotts, and vandalism could threaten ridership, COLTS stipulated its policy "was specifically to prevent debate inside of COLTS'[s] buses . . . and had nothing to do with debate outside the buses." App. 57. Yet COLTS has failed to cite a single debate caused by an ad on one of its buses.

To be sure, a government "need not wait until havoc is wreaked to restrict access to a nonpublic forum." *Cornelius*, 473 U.S. at 810. But if it wants to censor topics it deems "controversial," to avoid disruption, it needs more than mere supposition. *Cf. Air Line Pilots*, 45 F.3d at 1157 ("[T]here is no evidence that a *general* allowance of political or public interest advertising would otherwise undermine [the government's] ability to rent display cases. Only by imagining objections to particular viewpoints can any commercial inconvenience be conceived."). The censorship of messages *because* they are controversial is viewpoint discrimination. *See Brunetti*, 139 S. Ct. at 2299–2300. It follows that when the state seeks to ban particular topics for fear of public controversy, it must make a showing of threatened disruption.

But the record provides ample reason to doubt COLTS's concerns. COLTS has never received a complaint about an ad, even though one ad hawked "notes from the underground" and "bulletproof commentary for enlightened minds" courtesy of a racist and anti-Semitic blog. App. 346–49. No one complained about the bevy of religious and political ads COLTS ran before it enacted its policies. In fact, the only rider complaints in the record relate to COLTS's decision to *exclude* Freethought's ad.

26

What about COLTS's solicitude for a captive audience? The Supreme Court has long connected reasonableness in protecting a forum with the intrusiveness of the restricted expressive activity. *See Lehman*, 418 U.S. at 304 (plurality opinion); *id.* at 308 (Douglas, J., concurring in the judgment);[3] *Air Line Pilots*, 45 F.3d at 1161–62 (Flaum, J., concurring) (collecting cases). But COLTS's stated interest in leaving a captive audience in peace is undercut because much of the relevant forum is the *exterior* of its buses.[4] A rider may see the

---

[3] In *Lehman*, the Supreme Court upheld a prohibition on political advertisements in buses' "car card" interior advertising spaces. 418 U.S. at 299, 303–04 (plurality opinion). A plurality held the prohibition was reasonable in part because captive riders would otherwise be "subjected to the blare of political propaganda." *Id.* at 304. In his concurrence in the judgment, Justice Douglas agreed—not because political ads were especially objectionable, but because riders were a captive audience. *Id.* at 307–08 (Douglas, J., concurring in the judgment). *Lehman* predates modern public forum analysis but has been retconned into that framework. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992); *Cornelius*, 473 U.S. at 803–04.

[4] Paradoxically, COLTS insists the forum is limited to the exterior ad space. We define the relevant forum by the access the speaker seeks. *Cornelius*, 473 U.S. at 801. But here Freethought didn't specify whether it sought access to the exterior or interior space and COLTS rejected the ad out of hand, so the parties never discussed placement. We agree with

27

ad for a few moments as the bus approaches or while boarding, but is not subjected to it while riding the bus. Such contact is hardly as intrusive as, say, solicitation. *See Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 689 (1992) (O'Connor, J., concurring); *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 209 n.5 (1975) ("[B]oth the plurality and concurring opinions [in *Lehman*] recognized that the degree of captivity and the resultant intrusion on privacy is significantly greater for a passenger on a bus than for a person on the street."). To be sure, the captive audience concern does apply to part of COLTS's forum (the interior space). But *Lehman* is "properly . . . viewed as [a] narrow exception[] to the general prohibition against subject-matter distinctions." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 539 (1980). "The plain, if at times disquieting, truth is that in our pluralistic society, constantly proliferating new and ingenious forms of expression, 'we are inescapably captive audiences for many purposes.'" *Erznoznik*, 422 U.S. at 210 (quoting *Rowan v. U.S. Post Office Dep't*, 397 U.S. 728, 736 (1970)). And the traditional rule is that offended observers must "avoid further bombardment of their sensibilities simply by averting their eyes." *Lehman*, 418 U.S. at 320 (Brennan, J., dissenting) (quoting *Cohen v. California*, 403 U.S. 15, 21 (1971)). For those reasons and the ones that follow, we do not

---

Freethought that the forum includes both spaces, which are governed by the same policy. *Cf. Christ's Bride*, 148 F.3d at 248 n.2. Since COLTS doesn't view the two spaces as different enough to warrant different treatment, we see no reason why it should benefit from rejecting Freethought's ad before the parties ever discussed what kind of ad it would be.

28

think solicitude for a (partially) captive audience can bear the weight of COLTS's restrictions.

Beyond the thin support for its concerns, COLTS's enforcement is scattershot at best. COLTS ran an ad encouraging parents to immunize their children—an ad it maintains it would not run today. App. 49–50, 1141. That's presumably because vaccination has become a contentious social and political issue. *See Freethought*, 327 F. Supp. 3d at 781 ("COLTS admittedly ran the immunization advertisement without a clear understanding of the controversial nature of the subject matter at the time . . . ."). How did Wintermantel learn of this debate? Through "[f]riends with kids, and news[] media." App. 1141. We don't blame Wintermantel for doing her level best, but this episode reveals the arbitrariness in COLTS's approach. *See Mansky*, 138 S. Ct. at 1890 ("[T]hat measure may turn in significant part on the background knowledge and media consumption of the particular [official] applying it.").

It's also unclear whether and when information about an advertiser beyond the face of the ad is relevant. At least under the 2011 policy, COLTS would sometimes access the advertiser's website before rejecting an ad. For example, it excluded the facially permissible "Wilkes-Barre Scranton Night Out" because its website showed the event promoted drinking. *See* App. 1074–75. The same scrutiny wasn't applied to the racist and anti-Semitic blog—much to COLTS's horror when it was shown the bigoted website during this litigation. While COLTS says that under the 2013 policy it no longer considers anything beyond the face of an ad, there was deposition testimony that COLTS accepted Freethought's fourth ad in part because the "website did not encourage debate." App. 1358. And when Wintermantel emailed

29

COLTS's lawyer about the ad, she referenced Freethought's website and its definition of the organization. The lawyer's response—"[w]e have to research this," App. 1528—also suggested they would go beyond the face of the ad. These inconsistencies raise the specter of arbitrary censorship. An obscure religious reference may be allowed, while the same message from a better-known faith tradition is excluded. Even worse, officials may selectively decide to dig deeper when they receive proposals from disfavored groups.

Given all that, COLTS's reasonableness argument is threadbare. And it reaches its breaking point when we come to the religious speech ban. COLTS likely could exclude many ads that might upset its riders through more targeted prohibitions. *See Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 910 F.3d 1248, 1254 n.3 (D.C. Cir. 2018) (Griffith, J., dissenting from denial of rehearing en banc) ("WMATA was concerned about the public response to ads on controversial issues, but as the Archdiocese points out, WMATA's policies separately address issue-oriented ads without any need for its ban on religious speech."); *Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth.*, 901 F.3d 356, 370 (D.C. Cir. 2018) ("WMATA decided to refuse AFDI's advertisements only because of their political nature."), *cert. denied*, 2019 WL 400746 (U.S. June 3, 2019); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp. (SMART)*, 698 F.3d 885, 894 (6th Cir. 2012) ("Because the ban on political advertising was permissible, it was reasonable for SMART to turn down the fatwa advertisement as political.").

Instead, COLTS banned all religious messages. Even if that weren't viewpoint discrimination, it is unreasonable to so broadly single out for exclusion speech entitled to special

30

protection. *See Ridley v. Mass. Bay Transp. Auth.*, 390 F.3d 65, 100 (1st Cir. 2004) (Torruella, J., concurring in part and dissenting in part) ("Simply put, the First Amendment does not recognize state authority to regulate religious expression merely because it might offend other persons."); *Hedges*, 9 F.3d at 1298 ("Even when the government may forbid a category of speech outright, it may not discriminate on account of the speaker's viewpoint. Especially not on account of a religious subject matter, which the free exercise clause of the first amendment singles out for protection." (citation omitted)); *see also Murdock v. Pennsylvania*, 319 U.S. 105, 109 (1943) (religious advertising "occupies the same high estate under the First Amendment as do worship in the churches and preaching from the pulpits"); *cf. Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017) ("The Free Exercise Clause 'protect[s] religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 533, 542 (1993))).

COLTS argues with some force that its blanket ban serves valid interests in appearing neutral. But the "'guarantee of neutrality is respected, not offended' when religious persons benefit incidentally from 'neutral criteria and evenhanded policies.'" *Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 177 (3d Cir. 2002) (quoting *Good News Club*, 533 U.S. at 114). There's nothing neutral about prohibiting all religious speech as "disruptive."

Moreover, under COLTS's current approach, it must distinguish messages that are "about" religion from those that address a permitted topic from a religious perspective. Assuming that distinction is viable, we question whether it is

31

reasonable to ask officials to draw it. True, reasonableness review imposes a light burden. *NAACP*, 834 F.3d at 449. And we do not suggest there is any one way that COLTS had to pursue its interests. But COLTS bears the burden to show that extirpating religion from its forum was reasonable. *Id.* at 443. For all the reasons we have stated, we hold it has not done so.

VII

Having prevailed on the merits, Freethought must show it is entitled to a permanent injunction as a matter of discretion. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010). It must show that (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in its favor; and (4) granting an injunction would not be against the public interest. *eBay*, 547 U.S. at 391. Each element is satisfied.

The first two elements "typically constitute two sides of the same inquiry, for the 'availability of adequate monetary damages belies a claim of irreparable injury.'" *TD Bank NA v. Hill*, 928 F.3d 259, 282 (3d Cir. 2019) (quoting *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008)). Freethought's ad has already been rejected once under the 2013 policy, which remains in effect. No remedy at law can cure Freethought's First Amendment injury or give it the prospective relief it seeks. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). To receive full relief, Freethought must be allowed to run its "Atheists" ad. Similarly, the balance of hardships tips in Freethought's favor. COLTS's "need to redraft one part of [the 2013 policy] . . . hardly compare[s] to

32

the deprivation of [Freethought] and . . . other potential speakers' constitutional right to engage in free speech." *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1229–30 (11th Cir. 2017). Finally, we state the obvious by noting that the public interest is not disserved by enforcing the First Amendment's core protection against viewpoint discrimination.

\*    \*    \*

The 2013 policy's ban on speech related to religion discriminates on the basis of viewpoint. And it is not a permissible limitation on COLTS's forum, however that forum is characterized. We will reverse the judgment of the District Court and instruct it to grant declaratory relief and issue an injunction barring enforcement of the 2013 policy's religious speech ban against Freethought.

33

COWEN, *Circuit Judge*, dissenting.

The majority concludes that COLTS's policy discriminates based on viewpoint and that, even if the policy were viewpoint neutral, it fails to survive scrutiny as a content-based restriction. However, I do not believe that the transit system's policy rises to the level of viewpoint discrimination. As the D.C. Circuit has recently explained, there is a critical difference between the prohibition of religious (and atheistic) perspectives on otherwise permissible subject matters—which constitutes viewpoint discrimination—and the exclusion of religion itself as a subject matter—which does not. This case clearly implicates a subject-matter prohibition. Furthermore, COLTS satisfies its burden of showing that its policy is reasonable (and I conclude that it has closed the forum). Accordingly, I must respectfully dissent.

I.

According to the majority, its holding that COLTS's 2013 Policy facially discriminates against religious and atheistic viewpoints on the various topics otherwise permitted in the forum "diverges from a recent decision of the United States Court of Appeals for the D.C. Circuit, Archdiocese of Washington v. Washington Metropolitan Area Transit Authority, 897 F.3d 314 (D.C. Cir. 2018), petition for cert. filed, No. 18-1455 (May 20, 2019)." (Majority Opinion at 17-18.) Among other things, it asserts that the purported "prerogative" to exclude religion as a subject matter is premised on dictum in Rosenberger v. Rector and Visitors of University of Virginia, 515 U.S. 819 (1995), which the Supreme Court disclaimed in Good News Club v. Milford

Central School, 533 U.S. 98 (2001). "[T]o the extent the D.C. Circuit reasoned that religious speech on a permissible topic may be censored if it is not 'primarily' about that topic, see Archdiocese of Wash, 897 F.3d at 329, we disagree with that too. As the Supreme Court explained in Good News Club, that a message on a permitted topic is 'quintessentially religious' or 'decidedly religious in nature' does not relegate it to second-class status. See 533 U.S. at 111." (Id. at 21.) In the end, the majority determines that Freethought's "Atheists" advertisement, although it relates to the subject matter of religion, communicates a viewpoint on other subject matters permitted in the forum.

To addition to disagreeing with its assessment of the "Atheists" advertisement, I reject the majority's reading of the existing case law as well as (on a more fundamental level) its understanding of the fundamental concepts of viewpoint and subject matter. In short, like its Washington, D.C. counterpart, COLTS "may exclude religion as a subject matter from its advertising space." Archdiocese of Wash., 897 F.3d at 319.

Initially, the majority places special emphasis on the Supreme Court's decision in Good News Club. It, however, has read too much into this opinion. In Rosenberger, the Supreme Court stated that, "[b]y the very terms of the SAF prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." Rosenberger, 515 U.S. at 831. In Good News Club, the Court did explain that, "[a]lthough in Rosenberger there was no prohibition on religion as a subject matter, our holding did not rely on this factor," Good News Club, 533

2

U.S. at 110, and rejected the notion that "something that is quintessentially religious' or 'decidedly religious in nature" cannot "also be characterized properly as the teaching of morals and character development from a particular viewpoint," id. at 111 (citing Good News Club v. Milford Cent. Sch., 202 F.3d 502, 512 (2d Cir. 2000) (Jacobs, J., dissenting)). It did not "disclaim" the government's prerogative or power to ban a particular subject matter without thereby engaging in unconstitutional viewpoint discrimination. Nor did the Good News Club Court specifically examine the question of how to treat speech on the subject matter of religion that is "not 'primarily' about" some other permissible topic (id. (quoting Archdiocese of Wash., 897 F.3d at 329).) On the contrary, the Court's reasoning is premised on the fundamental distinction between viewpoint and subject matter. It explained that Rosenberger "concluded *simply* that the university's denial of funding to print Wide Awake was viewpoint discrimination, just as the school district's refusal to allow Lamb's Chapel to show its films was viewpoint discrimination." Id. at 110 (emphasis added) (citing Rosenberger, 515 U.S. at 831). The Supreme Court then rejected the Second Circuit's belief that the highly religious aspects of the Good News Club's teaching of morals and character development effectively "tainted" its expression so that it no longer constituted a viewpoint on the otherwise permissible subject matter of moral and character education, e.g.:

> What matters for purposes of the Free Speech Clause is that we can see no logical difference in kind between the invocation of Christianity by the Club and the invocation of teamwork, loyalty, or patriotism by other associations to

3

provide a foundation for their lessons. It is apparent that the unstated principle of the Court of Appeals' reasoning is its conclusion that any time religious instruction and prayer are used to discuss morals and character, the discussion is simply not a "pure" discussion of those issues. According to the Court of Appeals, reliance on Christian principles taints moral and character instruction in a way that other foundations for thought or viewpoints do not. We, however, have never reached such a conclusion. Instead, we reaffirm our holdings in <u>Lamb's Chapel</u> and <u>Rosenberger</u> that speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint. Thus, we conclude that Milford's exclusion of the Club from use of the school, pursuant to its community use policy, constitutes impermissible viewpoint discrimination.

<u>Id.</u> at 111-12 (footnote omitted); <u>see also, e.g.</u>, <u>Child Evangelism Fellowship of N.J., Inc. v. Stafford Twp. Sch. Dist.</u>, 386 F.3d 514, 528 (3d Cir. 2004) (observing that <u>Good News Club</u> rejected Second Circuit's position that something that is quintessentially religious or decidedly religious in nature cannot also be characterized as teaching of morals and character from particular viewpoint and that what ultimately mattered was lack of logical difference between invocation of Christianity and invocation of teamwork, loyalty, or patriotism as foundation for such teaching). The Supreme Court then proceeded to distinguish the club's activities from "mere religious worship, divorced from any teaching of moral

4

values." Good News Club, 533 U.S. at 112 n.4 (further noting that Second Circuit never determined that activities actually constituted religious worship and explaining that, "[r]egardless of the label Justice Souter wishes to use [i.e., an evangelical service of worship], what matters is the substance of the Club's activities, which we conclude are materially indistinguishable from the activities in Lamb's Chapel and Rosenberger").

This narrower reading of Good News Club is consistent with basic First Amendment principles. As Judge Wilkins succinctly put it, the "[f]orum doctrine's boundary between permissible subject-matter restrictions and impermissible viewpoint discrimination is a load-bearing wall in the First Amendment's structure." Archdiocese of Wash., 897 F.3d at 339 (Wilkins, J., concurring).

Even the majority appears to recognize that there is a well-established and fundamental distinction between subject-matter and viewpoint restrictions. It certainly may be difficult to distinguish subject matter from viewpoint, especially where the subject matter at issue constitutes both a comprehensive body of thought (i.e., a subject matter) and a source for points of view from which to discuss a variety of other subject matters (i.e., viewpoints). See, e.g., Rosenberger, 515 U.S. at 830-31. But it is well established that "a government may sometimes impose content or speaker limitations that protect the use of its property," while, "no matter what kind of property is at issue, viewpoint discrimination is out of bounds." (Id. at 11 (citing Minn. Voters All. v. Mansky, 138 S. Ct. 1876, 1885 (2018)).) Accordingly:

> [T]he Supreme Court has repeatedly upheld and applied the distinction between subject matter and viewpoint. See, e.g., Mansky, 138 S. Ct. at 1885 ("[O]ur decisions have long recognized that the government may impose some content-based restrictions in nonpublic forum[s]."); Reed v. Town of Gilbert, [135 S. Ct. 2218, 2230] (2015) ("Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination" than subject-matter restrictions (quotation marks omitted)); Rosenberger, [515 U.S. at 830-31] (distinguishing between restricting religious subject matter and religious viewpoints).

Archdiocese of Wash., 897 F.3d at 338-39 (Wilkins, J., concurring). "[T]he speech restrictions struck down in Lamb's Chapel, Rosenberger, and Good News Club each singled out religious viewpoints that otherwise fell within prospectively defined, permissible subject matter. Stated otherwise, those decisions involved rules that permitted private speakers to discuss categories A, B, and C, but when a speaker sought to discuss C from a pro-religious perspective, they were improperly prohibited from doing so." Id. at 338 (Wilkins, J., concurring). In contrast, WMATA barred advertisements that promote or oppose any religion, religious practice, or belief: "Guideline 12 is thus a categorical subject-matter restriction by its own terms: It prohibits any advertisement whatsoever on the subject of religious or anti-religious advocacy, whether favoring or opposing religion in

general, or any particular religion, belief, or practice."[1]  Id. at 337 (Wilkins, J., concurring) (citing Rosenberger, 515 U.S. at 831); see also, e.g., id. at 325 ("But far from being an abrogation of the distinction between permissible subject matter rules and impermissible viewpoint discrimination, each of these cases represents an application of the Supreme Court's viewpoint discrimination analysis, of which Guideline 12 does not run afoul."); Child Evangelism Fellowship, 386 F.3d at 528 ("Cases such as Lamb's Chapel, Rosenberger, and Good News Club establish that if government permits the discussion of a topic from a secular perspective, it may not shut out speech that discusses the same topic from a religious perspective.").

This distinction between viewpoint and subject matter actually encourages the government to open (or keep open)

---

[1] According to the majority, the D.C. Circuit's reasoning echoes the dissent in Rosenberger. But the Supreme Court majority obviously did not believe it was eviscerating the basic distinction between viewpoint and subject matter. After all, Rosenberger explained, inter alia, that religion—even though it may be "a comprehensive body of thought" or "a vast area of inquiry"—"*also* provides, as it did here, a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." Rosenberger, 515 U.S. at 831 (emphasis added). "The prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments for the subjects discussed were otherwise within the approved category of publications." Id.  Likewise, neither I nor the D.C. Circuit take issue with Rosenberger's recognition that not "all debate is bipolar." Id.

forums to speech that they might otherwise completely exclude. The principle that the government may restrict speech in a non-public forum so long as it maintains viewpoint neutrality and acts reasonably "'encourage[s] the government to open its property to some expressive activity in cases where, if faced with an all or nothing choice, it might not open the property at all.'" Archdiocese of Wash., 897 F.3d at 324 (quoting Ark. Educ. Television Comm'n v. Forbes, 523 U.S. 666, 680 (1998))). The government is also required to establish prospective and categorical subject matter regulations, thereby preserving its ability to manage potentially sensitive non-public forums while cabining its discretion to censor. Id. at 324-25 (further noting importance of such constraint in context of religious speech given constitutional commitment to religious liberty and role of religiously motivated dissent in landmark free speech case law); see also, e.g., id. at 337 (Wilkins, J., concurring) (observing that requirement to set prospective and categorical rules provides public with notice of what speech is allowed and constrains discretion of government to pick favorites on ad hoc basis). One basic premise of the First Amendment is to encourage more— not less—speech. See, e.g., Citizens United v. FEC, 558 U.S. 310, 361 (2010) ("[I]t is our law and tradition that more speech, not less, is the governing rule."). Yet "[w]ithout reasonable control over the content of private speech in nonpublic forums, government may elect to close a forum entirely rather than deal with the administrative burden or floodgate consequences of accepting private speech without effective subject-matter restrictions." Archdiocese of Wash., 897 F.3d at 337 (Wilkins, J., concurring). In fact, the majority suggests that COLTS would have to exclude even more speech if it wished to adopt a constitutionally effective subject-matter limitation.

Furthermore, the majority's approach "offers no principled reason for excepting religion from the general proposition that governments may exclude subjects in their non-public forums." Id. at 325. The majority suggests that religious advertisements are "entitled to special protection" (id. at 30-31 (citing Ridley v. Mass. Bay Transp. Auth., 390 F.3d 65, 100 (1st Cir. 2004) (Torruella, J., concurring in part and dissenting in part); Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1298 (7th Cir. 1993); Murdock v. Pennsylvania, 319 U.S. 105, 109 (1943); Trinity Lutheran Church of Columbia, Inc. v. Comer, 137 S. Ct. 2012, 2019 (2017)))—over and above the protection accorded to "issue-oriented" or political advertisements (id. at 29-30 (citing Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 910 F.3d 1248, 1254 n.3 (D.C. Cir. 2018) (Griffith, J., dissenting from denial of rehearing en banc); Am. Freedom Def. Initiative v. Wash. Metro. Area Transit Auth., 901 F.3d 356, 370 (D.C. Cir. 2018), cert. denied, 139 S. Ct. 2665 (2019); Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Transp., 698 F.3d 885, 894 (6th Cir. 2012))). Like the D.C. Circuit, I agree that the protection of religious expression is of critical importance. See, e.g., id. at 324-25. Yet the same thing could be said about political speech. Like religion, politics "also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered,'" Rosenberger, 515 U.S. at 825. "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in *politics*, nationalism, religion, or other matters of opinion." W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 642 (1943) (emphasis added); see also, e.g., Archdiocese of Wash., 897 F.3d at 339 (Wilkins, J.,

9

concurring) ("After all, *political* speech has frequently been designated as the most highly protected form of First Amendment expression." (citing Pursuing America's Greatness v. FEC, 831 F.3d 500, 508 (D.C. Cir. 2016)). Bans on political speech in non-public forums have been upheld, and a more expansive approach to viewpoint discrimination may force the complete closure of non-public forums to all private speech. See, e.g., Archdiocese of Wash., 897 F.3d at 325 ("Although religious speech might be an exception either because it is highly valuable or because it receives specific protection in the First Amendment, the same can be said of political speech on which the Supreme Court has upheld bans against constitutional challenges. See, e.g., Ark. Educ. Television Comm'n, [523 U.S. at 669]; [Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788 (1985)]. The Archdiocese's position could have sweeping implications for what speech a government may be compelled to allow once it allows any at all, even forcing a choice between opening non-public forums to almost any private speech or none, which the Supreme Court acknowledged in Arkansas Educational Television Commission, [523 U.S. at 680], was not merely hypothetical.").

The majority calls into question D.C. Circuit's indication that speech on an impermissible subject matter may be barred if it does not also "primarily" relate to a permissible subject matter. In addition to reading too much into the Supreme Court's Good News Club opinion, the majority overlooks the D.C. Circuit's reference to whether the advertisement is "recognizably" about a permissible topic. Id. at 329. Judge Wilkins also aptly observes that "such alleged 'viewpoint' discrimination could always be reverse-engineered by comparing a prohibited statement with any

permitted statement—real or hypothetical—and finding some kind of subject-matter commonality between the two." Id. at 338 (Wilkins, J., concurring). Such an expansive understanding (especially because it must logically extend to other subject matters like politics) would effectively make it impossible to establish any content requirements for non-public forums or otherwise cause governmental entities to close their forums to yet more and more topics for expression.[2]

Applying the D.C. Circuit's approach, I see no meaningful difference between the advertisements and policies at issue in the WMATA proceeding and in this case. Accordingly, the District Court did not err by rejecting Freethought's claim of viewpoint discrimination.

---

[2] I further note that Freethought's briefing in this case does not really take issue with the D.C. Circuit's "subject matter" approach—and instead endeavors to distinguish COLTS's policy from the policy adopted by the WMATA. (See, e.g., Appellant's Brief at 29-30 ("COLTS' 'religious' provision goes far beyond prohibiting advertisements on the topics of religion or atheism. It also prohibits advertisements on any topic that contains any reference to the existence of religion or atheism. Cf., Archdiocese of Wash. v. Wash. Metro. Area Transit Auth., 877 F.3d 1066, 1067 (D.C. Cir. 2017) [(denying motion for injunction pending appeal)] ('WMATA does not exclude religious speakers from advertising when their proposed messages comport with the allowed categories of speech.')." (citations omitted)).)

11

Initially, both the "religion" provisions as well as the respective forums are very similar.[3] Like other public transit agencies around the country, both COLTS and WMATA (which previously had maintained designated public forums on their advertising space) have attempted to address (or to prevent in the future) problems arising from various inflammatory advertisements (see, e.g., id. at 6 ("[Wintermantel] began researching other transit systems' policies and identified controversies in other cities kindled by inflammatory ad campaigns.")). See, e.g., id. at 319 ("Beginning in 2010, WMATA began to reconsider its

---

[3] The majority takes issue with the D.C. Circuit's "choice to conduct a forum analysis before determining whether the policy discriminated on the basis of viewpoint." (Majority Opinion at 19.) I completely agree that viewpoint discrimination is not permitted in any forum. But this does not mean that the nature and scope of the forum is irrelevant to the determination of whether there is viewpoint discrimination. Even the majority considers whether the range of subject matters permitted in the forum at issue includes a topic the speaker wants to address. Furthermore, "[a]lthough observing that 'Lamb's Chapel, Rosenberger, and Good News Club, read together, draw into question whether a blanket ban such as Vermont's on all religious messages in a forum that has otherwise been broadly opened to expression on a wide variety of subjects can neatly be classified as purely a "subject matter" restriction for purposes of First Amendment analysis,' the [Second Circuit] declined to 'address bans on religious speech in forums limited to discussion of certain, designated topics.'" Archdiocese of Wash., 897 F.3d at 327 (quoting Byrne v. Rutledge, 623 F.3d 46, 58-59 (2d Cir. 2010)).

12

approach as a result of near-monthly complaints from its employees, riders, elected officials, and community and business leaders about its advertisements. . . . The Metro Transit Police Department and the United States Department of Homeland Security 'feared that certain ads would, due to world events, incite individuals to violence on the system and harm WMATA employees and customers.' . . . . Additionally, a survey showed that '98% of the public was familiar with the types of ads found on buses, in trains, and in stations,' that '58% opposed issue-oriented ads,' and that '46% were extremely opposed to . . . issue-oriented ads.'" (citations omitted)). Accordingly, the 2013 COLTS Policy prohibits the following advertisements:

- for tobacco or alcohol or for businesses that primarily traffic in such goods;
- that promotes the use of firearms or firearm-related products or for businesses that primarily traffic in such goods;
- that are obscene, pornographic, or promotes or depict sexually-oriented goods or services or for businesses that primarily traffic in such goods or services or that appeal to prurient interests;
- that promotes violence or sexual conduct;
- that are deemed defamatory, illegal, fraudulent, misleading or false;
- that proposes a transaction or activity that is prohibited by federal, state or local law;
- that exploit the likeness, picture, image or name of any person, and/or trademark, trade name, copyrighted materials or other intellectual property of a third party, without adequate proof of express written authorization to do so;

13

- that contain, employ or imply profane or vulgar words;
- that demean or disparage a person, group of persons, business or group of businesses;
- that, if permitted, could reasonably subject COLTS to civil or criminal liability;
- that are political in nature or contain political messages, including advertisements involving political figures or candidates for public offices, advertisements involving political parties or political affiliations, and/or advertisements involving an issue reasonably deemed by COLTS to be political in nature in that it directly or indirectly implicates the action, inaction, prospective action, or policies of a governmental entity.
- that promote the existence or non-existence of a supreme deity, deities, being or beings; that address, promote, criticize or attack a religion or religions, religious beliefs or lack of religious beliefs; that directly quote or cite scriptures, religious text or texts involving religious beliefs or lack of religious beliefs; or are otherwise religious in nature.

(JA687-JA688.) "WMATA adopted <u>Guidelines Governing Commercial Advertising</u>, employing broad subject-matter prohibitions in order to maintain viewpoint neutrality and avoid *ad hoc* prohibitions about which ads are benign and which are not." <u>Archdiocese of Wash.</u>, 897 F.3d at 318-19. Like COLTS's ban on advertisements that promote, criticize, or attack a religion, religions, religious beliefs, or the lack of religious beliefs, "Guideline 12 states: 'Advertisements that

14

promote or oppose any religion, religious practice or belief are prohibited.'" Id. The WMATA Guidelines also included the following prohibitions:

> 9. Advertisements intended to influence members of the public regarding an issue on which there are varying opinions are prohibited.
>
> 10. Advertisements of tobacco products are prohibited . . . .
>
> 11. Advertisements that support or oppose any political party or candidate are prohibited.
>
> 13. Advertisements that support or oppose an industry position or industry goal without any direct commercial benefit to the advertiser are prohibited.
>
> 14. Advertisements that are intended to influence public policy are prohibited.

Archdiocese of Wash. v. Wash. Metro. Area. Transit Auth., 281 F. Supp. 3d 88, 96 (D.D.C. 2017) (Guideline 12 omitted) (citation omitted).

The WMATA's Guidelines—and consequently COLTS's equivalent standards—are unlike the policies at issue in Lamb's Chapel, Rosenberger, and Good News Club. "To the extent those cases can be read to blur the line between religion-as-subject-matter and a religious viewpoint, the Supreme Court's analysis emphasizes the breadth of the forums involved: the "broad range" of activities in service of

15

"educational purpose" contemplated in Rosenberger, [515 U.S. at 824], and the capacious range of 'social, civic, and recreational meetings and entertainments, and other uses pertaining to the welfare of the community' that might have been permitted in [Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 386 (1993)], and Good News Club, [533 U.S. at 102]." Archdiocese of Wash., 897 F.3d at 327. "By contrast, [WMATA's forum as well as COLTS's forum—consisting of advertising space—are] not so broad, much less inviting through [their] advertisements public debate on religion." Id.

The Archdiocese of Washington's proposed "evangelistic ad" depicted "'a starry night and the silhouettes of three shepherds and sheep on a hill facing a bright shining star high in the sky, along with the words "Find the Perfect Gift"'" (and included a web address and social media hashtag). (Majority Opinion at 18 (quoting Archdiocese of Wash., 897 F.3d at 320).) The D.C. Circuit persuasively rejected the Archdiocese's argument that its advertisement addressed permissible topics like charitable giving (as well as an amici's assertion that its advertisement exhorting viewers to visit the Franciscan Monastery of the Holy Land in America expressed its religious viewpoint on places to visit):

> These contentions are unpersuasive because the subjects on which the Archdiocese and the Monastery claim they wish to speak through advertisements on WMATA buses are either not subjects within the forum or are not subjects on which they have shown they could not speak under Guideline 12.

16

The Archdiocese's "Find the Perfect Gift" ad is not primarily or recognizably about charitable giving, as it is not primarily or recognizably about opening hours or places to visit. Like the Monastery's ad, the Archdiocese's ad is a religious ad, an exhortation, repeatedly acknowledged by the Archdiocese to be part of its evangelization effort to attend mass at Catholic churches in connection with Advent. The imagery of the Archdiocese's "Find the Perfect Gift" ad is evocative not of the desirability of charitable giving, but rather the saving grace of Christ, which is not a subject included in the WMATA forum. Had the Archdiocese wished to submit an ad encouraging charitable giving, nothing in the record suggests it could not do so. WMATA accepted the ad of the Salvation Army, a religious organization whose ad exhorted giving to charity but contained only non-religious imagery. WMATA acknowledged in the district court, and again in this court that it would not reject as running afoul of Guideline 12 an ad from the Archdiocese that read "[P]lease [G]ive to Catholic Charities."

Id. at 329 (further rejecting Archdiocese's theory that commercial advertising promoting Christmastime sales expressed view on how to celebrate Christmas); see also, e.g., id. at 330 ("The Archdiocese's suggestion that WMATA has been inconsistent because it accepted an ad from a yoga studio containing the slogan 'Muscle + Mantra,' ignores that

17

ad is not recognizably religious as the Archdiocese's ad plainly is, by its own characterization.").

Freethought's proposed advertisement says in big print "Atheists," and provides the name of the organization and a website. In fact, it goes to the very heart of the subject matter of religion—the existence or non-existence of a deity. The 2013 Policy expressly bars advertising "that promote the existence or non-existence of a supreme deity, deities, beings or beings" (JA687), and COLTS stipulated at trial that it rejected the proposed advertisement because "the proposed advertisement addressed the non-existence of a deity" (JA61; see also, e.g., JA701 (letter rejecting earlier proposed "Atheists" advertisement because "COLTS does not accept advertisements that promote the belief that 'there is no God' or advertisements that promote the belief that 'there is a God'"). Freethought engages in debates over the existence or non-existence of God. "A typical consequence of the appearance of Freethought at an event is the discussion of whether or not God exists." Ne. Pa. Freethought Soc'y v. Cty. of Lackawanna Transit Sys., 327 F. Supp. 3d 767, 771 (M.D. Pa. 2018). In turn, the proposed advertisement does not reference, to give just a couple of examples, either instruction in morals and character or the desirability of charitable giving from an atheistic point of view. Accordingly, I believe that—just like the Archdiocese of Washington's "Find the Perfect Gift" submission—Freethought's advertisement clearly implicates the prohibited subject matter of religion.

II.

18

The majority concludes that, even if COLTS's religious speech ban were viewpoint neutral and COLTS's advertising space were now a limited or non-public forum,[4] it

---

[4] Unlike the majority, I believe that COLTS effectively closed the forum at issue here. While COLTS had previously opened its advertising space as a designated public forum, it "may limit or close the forum at any time" (Majority Opinion at 22 n.2 (citing United States v. Bjerke, 796 F.2d 643, 647 (3d Cir. 1986))). See, e.g., Archdiocese of Wash., 897 F.3d at 323 ("Having plainly evinced its intent in 2015 to close WMATA's advertising space to certain subjects, the Board of Directors converted that space into a non-public forum in the manner contemplated by the Supreme Court." (citing Cornelius, 473 U.S. at 803-04)); Ridley, 390 F.3d at 77 ("The government is free to change the nature of any nontraditional forum as it wishes. Thus, even if MBTA's previous intent was to maintain a designated public forum, it would be free to decide *in good faith* to close the forum at any time. There is no evidence that the 2003 changes were adopted as a mere pretext to reject plaintiff's advertisements." (citing Cornelius, 473 U.S. at 802)). Even setting aside the purportedly deficient language identified by the majority, the 2013 Policy sets forth a number of categorical subject-matter limitations, excluding, among other topics, advertisements on the topic of religion as well as political advertising (i.e., advertisements "that are political in nature or contain political messages, including advertisements involving political figures or candidates for public offices, [and/or] advertisements involving political parties or political affiliations" (JA687)). As I explain in more detail in my reasonableness analysis, COLTS properly sought to address issues affecting transit agencies throughout the country, including threats, boycotts,

does not survive scrutiny as a content-based restriction.  I do not agree.

The reasonableness standard is more exacting than the rational basis inquiry, and the government bears the burden of proof.  See, e.g., NAACP v. City of Philadelphia, 834 F.3d 435, 441-45 (3d Cir. 2016).  Nevertheless, "[r]easonableness is a relatively low bar."  Id. at 443.  "Unlike with strict scrutiny, this review does not require narrow tailoring or the absence of less restrictive alternatives.  Indeed, the 'Government's decision to restrict access . . . need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation.'"  Id. at 441 (quoting Cornelius, 473 U.S. at 808).  COLTS has a two-step burden to meet:  (1) "The evidence or commonsense inferences must allow us to grasp the purpose to which [COLTS] has devoted the forum;" and (2) "the evidence or commonsense inferences also must provide a way of tying the limitation on speech to the forum's purpose."  Id. at 445 (quoting Greer v. Spock, 424 U.S. 828, 836 (1976)); see also, e.g., Mansky, 138 S. Ct. at 1888 ("Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." (citing Cornelius, 473 U.S. at 808-09)).

Significantly, the majority appears to agree that COLTS satisfies the first step, identifying raising revenue and maintaining or increasing ridership as purposes of the forum.  It properly rejects Freethought's assertion that the ridership interest should be disregarded "because COLTS stipulated that they were not goals when it first opened its ad space and

---

and vandalism.

20

when it enacted the 2011 policy." (Majority Opinion at 23-24.) "But we assess both the speech forum and the broader government property of which it is part. <u>See</u> <u>Cornelius</u>, 473 U.S. at 801-02. An advertising program that deters all or many riders is inconsistent with the purpose of a public bus. <u>See</u> <u>NAACP</u>, 834 F.3d at 445-46 (holding commonsense inferences can support explanation of forum's purpose)." (<u>Id.</u> at 24.)

"[T]he record demonstrates that the advertising policy, at its core, was enacted to avoid controversy on the buses for the safety and comfort of passengers. This, in turn, was to maintain ridership and, as a result, revenue." <u>Ne. Pa. Freethought Soc'y</u>, 327 F. Supp. 3d at 775 n.5. As the majority acknowledges, the government may exclude speech "because its controversial nature adversely impacts the forum's other purposes" (even though this sort of exclusion must be treated with a degree of skepticism). <u>United Food & Commercial Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.</u>, 163 F.3d 341, 356 (6th Cir. 1998) ("We note, however, that the Supreme Court has suggested that excluding speech because its controversial nature adversely impacts the forum's other purposes constitutes a reasonable restriction on access to a nonpublic forum." (citing <u>Cornelius</u>, 473 U.S. at 811)); <u>see also, e.g.</u>, <u>NAACP</u>, 834 F.3d at 446 ("We note at the outset that, although the City is permitted under the right circumstances to dedicate a limited public or

nonpublic forum to controversy avoidance, this objective is nebulous and not susceptible to objective verification. As a result, Supreme Court guidance cautions against readily drawing inferences, in the absence of evidence, that controversy avoidance renders the ban constitutional." (citing Cornelius, 473 U.S. at 812; Metromedia, Inc. v. City of San Diego, 453 U.S. 490, 510 (1981) (plurality opinion)).

COLTS reasonably asserts that heated debates on its buses could deter riders, distract the drivers, endanger passengers, and reduce revenue. "COLTS cited disruptions on other transit systems in formulating its policy—disruptions that led to anonymous threats against buses, as well as boycotts and vandalism." (Id. at 25.) It is certainly reasonable to infer that these problems could spread onto the buses themselves—and that such disturbances could then cost the transit system both riders and money. A government "need not wait until havoc is wreaked to restrict access to a nonpublic forum." Cornelius, 473 U.S. at 810 (citing Perry Educ. Ass'n v. Perry Local Educators' Ass'n, 37, 52 n.12 (1983)).

In Lehman, "Justice Douglas provided the fifth vote for the outcome in a concurring opinion that focused heavily on the issue of captive audiences." NAACP, 834 F.3d at 448 n.6 (citing Lehman v. City of Shaker Heights, 418 U.S. 298, 308 (1974) (Douglas, J., concurring in judgment)). At least part of COLTS's forum clearly implicates Justice Douglas's concern. (See, e.g., id. at 28 ("To be sure, the captive audience concern does apply to part of COLTS's forum (the interior space).").) "In asking us to force the system to accept [its] message as a vindication of [its] constitutional rights, [Freethought] overlooks the constitutional rights of the

22

commuters. While [Freethought] clearly has a right to express [its] views to those who wish to listen, [it] has no right to force [its] message upon an audience incapable of declining to receive it." Lehman, 418 U.S. at 307 (Douglas, J., concurring in judgment) (further noting that public transit is practical necessity for many people).

The majority also admits that "COLTS argues with some force that its blanket ban [on religious speech] serves valid interests in appearing neutral." (Id. at 31.) We have recognized that "[t]he desire to avoid potentially disruptive controversy and maintain the appearance of neutrality is sufficient justification for excluding speakers from a [limited forum]." Student Coalition for Peace v. Lower Merion Sch. Dist. Bd. of Sch. Directors,. 776 F.2d 431, 437 (3d Cir. 1985) (citing Lehman, 418 U.S. at 304). As the Ninth Circuit explained in a decision upholding a transit system's ban on non-commercial bus advertising, "[t]he city's interests in protecting revenue and maintaining neutrality on political and religious issues are especially strong." Children of the Rosary v. City of Phoenix, 154 F.3d 972, 979 (9th Cir. 1998). "[I]n fact, Mr. Vacula testified that he wants the government to remain neutral on matters of religion," Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d at 782.

In conclusion, "reasonableness review imposes a light burden" (id. (citing NAACP, 834 F.3d at 449)), and I believe that COLTS meets this burden. At some points, the majority seems to hold the transit agency to a higher burden, indicating inter alia that it could exclude many controversial advertisements through more targeted restrictions. See, e.g., NAACP, 834 F.3d at 441 (pointing out that reasonableness review does not require narrow tailoring or absence of less

23

restrictive alternatives).  In any event, our sister circuits have upheld similar speech restrictions in the public transit context. See, e.g., Archdiocese of Wash., 897 F.3d at 329-31; Am. Freedom Def. Initiative. 698 F.3d at 892-95; Ridley, 390 F.3d at 93; Children of the Rosary, 154 F.3d at 978-79.  In Archdiocese of Washington, the D.C. Circuit persuasively explained why the WMATA's decision to ban advertisements on the subject matter of religion was reasonable.  "In 2015, WMATA decided to avoid the divisiveness caused by certain advertisements and specifically to avoid the inflamed passions surrounding religion."  Archdiocese of Wash., 897 F.3d at 330.  While WMATA actually received complaints regarding prior controversial advertisements, COLTS reasonably relied on reports of problems plaguing other transit agencies (including WMATA) throughout the country concerning controversial advertisements, such as advertisements regarding the non-existence of God.  Like WMATA, "[COLTS's] closure of its forum is reasonable in light of its core purpose and experience."[5]  Id.

III.

---

[5] I also agree with the District Court that "COLTS revised their 2011 Policy and, in the 2013 Policy, took away COLTS' unfettered discretion to refuse advertisements." Ne. Pa. Freethought Soc'y, 327 F. Supp. 3d at 784; see also, e.g., Archdiocese of Wash., 897 F.3d at 330 (upholding WMATA's policy because it articulated sensible basis for distinguishing prohibited and permissible speech).

24

For the foregoing reasons, I would affirm the final judgment entered by the District Court in favor of COLTS and against Freethought.