**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 19-1170
_____

THE CENTER FOR INVESTIGATIVE REPORTING,

Appellant

v.

SOUTHEASTERN PENNSYLVANIA
TRANSPORTATION AUTHORITY
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. Action No. 2-18-cv-01839)
District Judge:  Hon. Michael M. Baylson
_____

Argued October 23, 2019
_____

Before: GREENAWAY, JR., PORTER, and GREENBERG,
*Circuit Judges*.

(Filed: September 14, 2020)

Molly M. Tack-Hooper [ARGUED]
American Civil Liberties Union of Washington Foundation
901 Fifth Avenue
Suite 630
Seattle, WA 19102

Brian M. Hauss
American Civil Liberties Union
Speech, Privacy & Technology Project
125 Broad Street
18th Floor
New York, NY 10004

John S. Stapleton
LeVan Muhic Stapleton
601 Route 73 North
Four Greentree Centre
Suite 303
Marlton, NJ 08053

Rebecca S. Melley
Robert A. Wiygul
Hangley Aronchick Segal Pudlin & Schiller
One Logan Square
18th & Cherry Streets, 27th Floor
Philadelphia, PA 19103
        *Attorneys for Appellant*

Stephen G. Harvey
Steve Harvey Law
1880 John F. Kennedy Boulevard
Suite 1715
Philadelphia, PA 19103

James P. Davy
2362 East Harold Street
Philadelphia, PA 19125

Bruce D. Brown
The Reporters Committee for Freedom of the Press
1156 15th Street, N.W.
Suite 1020
Washington, DC 20005
        *Attorneys for Amicus Appellants*

Kendra L. Baisinger
Robert E. Day, III
Maryellen Madden [ARGUED]
John J. Powell
Montgomery McCracken Walker & Rhoads
1735 Market Street
21st Floor
Philadelphia, PA 19103
        *Attorneys for Appellee*

Gregory J. Krock
McGuireWoods LLP
Tower Two-Sixty
260 Forbes Avenue, 18th Floor
Pittsburgh, PA 15222
        *Attorney for Amicus Appellee*

_____

OPINION OF THE COURT
_____

GREENAWAY, JR., *Circuit Judge*.

Appellant Center for Investigative Reporting ("CIR") seeks a permanent injunction that would require the Southeastern Pennsylvania Transportation Authority ("SEPTA") to run an advertisement on the inside of SEPTA buses. The advertisement promotes CIR's research on racial disparities in the home mortgage lending market. SEPTA rejected the advertisement under two provisions of its 2015 Advertising Standards, which prohibit advertisements that are political in nature or discuss matters of public debate (the "Challenged Provisions"). The question presented is whether the Challenged Provisions violate the First Amendment. Because the Challenged Provisions are incapable of reasoned application, we answer that question yes. Accordingly, we will reverse and instruct the District Court to grant declaratory relief and issue a permanent injunction preventing SEPTA from enforcing the Challenged Provisions to exclude CIR's advertisement.

## I. BACKGROUND

### A. The Parties

SEPTA has operated Philadelphia's mass transit system, including buses, subways, commuter rail, light rail, and trolley service, since 1964.[1] Like many other public

[1] This Court has found, and the parties do not dispute, that SEPTA is a government actor "constrained by the First . . . Amendment[.]" *Christ's Bride Ministries, Inc. v. SEPTA*, 148 F.3d 242, 247 (3d Cir. 1998).

4

transportation authorities, SEPTA generates revenue by accepting advertisements that it displays in its facilities and on its vehicles. The advertising agency Intersection (formerly Titan Outdoor, LLC) manages SEPTA's advertising program, including selling advertising space and reviewing proposed advertisements. SEPTA's contract with Intersection includes the Advertising Standards, which apply to all the advertising space in or on SEPTA vehicles and facilities. When Intersection determines that a proposed advertisement may violate the Advertising Standards, it sends the advertisement to Gino Benedetti, SEPTA's General Counsel, who makes the final decision whether to accept the advertisement.

CIR is a California-based, nonprofit, investigative news organization. Its mission is to advance social justice through the dissemination of verifiable, nonpartisan facts about public issues. CIR publishes its reporting on various platforms, such as its news website Reveal (www.revealnews.org), national radio show, and podcast.

**B.**     **SEPTA's Rejection of the Proposed Advertisement**

In January 2018, CIR submitted a proposed advertisement for display on the interior of SEPTA buses. The proposed advertisement consisted of a comic strip entitled "A Stacked Deck," which summarized the findings of a then-forthcoming CIR report detailing the results of its year-long investigation into mortgage lending trends throughout the United States. The report, which CIR published on February 18, 2019, indicated that in 61 metropolitan areas, applicants of color were more likely to be denied conventional home purchase mortgages.

The proposed advertisement consists of the following comic strip:



# A STACKED DECK

*with Al Letson*



**Scroll down to read** ↓

Today in America, people of color are regularly being

**DENIED**

the dream of home ownership



Reveal from *The Center for Investigative Reporting* analyzed **31 MILLION** mortgage records and found **61** U.S. metro areas where people of color are far more likely to be turned down than whites when applying for a conventional home loan.



The nation's capital is the **ONE METRO AREA** where Native Americans, African Americans, Latinos, and Asians are **ALL** more likely to be denied a conventional home loan.



===== IN D.C. =====

Native American applicants are **2.3x**

Black applicants are **2.2x**

Latino applicants are **1.9x**

Asian applicants are **1.6x**

as likely to be denied than comparable **WHITE** applicants.

Want to find out if there are lending disparities in your neighborhood and get more updates? Text "LOAN" to Reveal and its partners at 202-873-8325.

(Text STOP or HELP to end or get assistance. Standard rates apply.)



This is just the latest in the United States' **SORDID HISTORY** of unequal access to owning a home.



In the 1930s, the federal government actually made housing discrimination a state-sponsored enterprise by drawing up maps that strangled investment in areas where immigrants and African Americans lived. This practice is called redlining.



The 1968 Fair Housing Act made redlining illegal, but discriminatory practices continued through predatory lending or "reverse redlining." Lenders flooded communities of color with inferior loan products AND limited access to conventional lines of credit.



Aimed at borrowers who lenders perceive as risky, subprime loans have higher interest rates and are more costly in the long run.



Unsurprisingly, when the subprime mortgage crisis crippled the economy in 2007, people of color were disproportionately affected by the fallout.

Which brings us back to the present. The economy is getting better and conventional mortgages are once again available... but not to the same degree for everybody.

For people of color in 2018 the conventional home loan market is still a deck stacked against them.



On February 22, 2018, SEPTA rejected CIR's proposed advertisement because "[d]isparate lending is a matter of public debate and litigation." App. 576. SEPTA included in its rejection email a copy of the 2015 Advertising Standards, which were operative at the time. *Id.* SEPTA later clarified that it rejected the proposed advertisement "under Standards 9(b)(iv)(a) and (b)" of the 2015 Advertising Standards. App. 613. These provisions, both of which CIR challenges, read:

> Prohibited Advertising Content. Advertising is prohibited on transit facilities, products and vehicles if it or its content falls into one or more of the following categories –
>
> (a)     Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited. In addition, advertisements that are political in nature or contain political messages, including advertisements involving political or judicial figures and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity.
>
> (b)     Advertisements expressing or advocating an opinion, position or viewpoint on matters of public debate about economic, political, religious, historical or social issues.

App. 616–17.

On August 6, 2018, months after commencing the instant action, CIR submitted a second proposed advertisement to SEPTA. As the District Court explained, the revised advertisement removed two panels from the original—one showing "a white hand handing keys and stick of dynamite to a black hand," and another showing "African-Americans holding signs protesting . . . and a white guy not part of the protest." *Ctr. for Investigative Reporting v. SEPTA*, 337 F. Supp. 3d 562, 574 (E.D. Pa. 2018) (alteration in original). In the letter accompanying this proposed advertisement, CIR explained that it removed the two panels because they were ones that SEPTA identified as particularly concerning.

By letter dated September 21, 2018, SEPTA rejected this second advertisement, explaining that it violated the same provisions as the first. SEPTA explained that the comic "as a whole," as opposed to isolated elements, violated the Advertising Standards. Dist. Ct. Dkt. 2:18-cv-01839, ECF No. 32-1 at 2. Despite its contention that the entire comic was problematic, SEPTA highlighted various unchanged, individual elements of the comic that continued to concern SEPTA. These include: On panel 1, the phrase "A STACKED DECK"; on panel 2, the words "regularly," "DENIED," and "dream"; on panel 6, the sentence "This is just the latest in the United States' SORDID HISTORY of unequal access to owning a home" and the accompanying image; and on panel 10, the phrase "a deck stacked against them" and the accompanying image. *Id.*

13

**C.    CIR's Allegations**

On May 2, 2018, CIR filed the Complaint, alleging that SEPTA violated its First and Fourteenth Amendment rights by rejecting its proposed advertisement. To vindicate these rights, CIR seeks a declaratory judgment that the Challenged Provisions are unconstitutional and a permanent injunction prohibiting SEPTA from enforcing the Challenged Provisions to exclude CIR's proposed advertisement.

**D.    District Court Proceedings**

On August 17, 2018, CIR filed a motion for a preliminary injunction. The Court authorized the parties to engage in limited discovery, including depositions, prior to the hearing on that motion. On September 14, 2018, the District Court held the preliminary injunction hearing.

On September 25, 2018, the District Court denied CIR's motion without prejudice. In reaching this holding, the District Court applied the familiar test for preliminary relief: "A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief." *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).

The District Court found that while CIR had shown that it suffered an irreparable injury, none of the other factors favored granting preliminary injunctive relief. The District Court explained that (1) because of the scant evidence about SEPTA's reasons for implementing the 2015 Advertising Standards the District Court could not determine whether CIR

14

was likely to succeed on the merits, and (2) neither the balance of the equities nor the public interest clearly supported either party. Because the bench trial was scheduled to begin in less than one week, the District Court determined that it would prioritize bringing the case to a final disposition. The District Court therefore declined to enter a preliminary injunction.

On October 1, 2018, the District Court held a bench trial. At trial, the District Court heard live testimony from Gino Benedetti, SEPTA's General Counsel, and the parties presented exhibits and stipulated facts.

At trial, as to Subsection (a) (*i.e.*, the political provision), Benedetti testified on direct examination that the terms "political" and "political in nature" were "essentially the same to [him]." *Ctr. for Investigative Reporting*, 337 F. Supp. 3d at 577. He stated that the phrase "directly or indirectly implicates the action, inaction, prospective action or policies of a government entity . . . defines or connects with what's political in nature." *Id.* On cross-examination, however, he testified that the terms "political" and "political in nature" have distinct and separate meanings and that "implicate" could mean "advocate[]" or "call[] for." *Id.*

As to Subsection (b) (*i.e.*, the public debate provision), Benedetti testified that to determine whether something is a "matter of public debate" he performs "a mechanical type of analysis that . . . look[s] to see what is being argued, debated in society in general." *Id.* He explained that he looks at "the entire ad" and evaluates "holistically . . . the subject matter of that ad being debated in society at large." *Id.* That process, according to Benedetti, requires that he use "common sense" and have discussions to determine what is a matter of public debate. *Id.* In addition, he testified that sometimes

15

advertisements that violate the public debate provision "could be controversial ads" and that an advertisement can involve politics and not violate either provision. *Id.* at 578.

At trial, as the District Court noted, Benedetti provided inconsistent testimony regarding his process for determining whether proposed advertisements violate the Advertising Standards. *Id.* at 578–80. He stated that he did not view certain advertisements for commercial services as political or touching on matters of public debate. *Id.* at 579. For example, he approved an advertisement by Fusion that depicted people of color, one of whom was wearing a shirt that read "My Life Matters," and displayed the phrase "As American Ads." *Id.* Benedetti testified that he did not view this advertisement as "implicat[ing] any matters of public debate on social issues." *Id.* (alteration in original).

Yet he also admitted that sometimes a commercial advertisement could pose a problem under the Challenged Provisions. For example, he testified that a hypothetical advertisement that said consumers can purchase Pepsi cheaper in Norristown (which does not have a soda tax) than in Philadelphia (which does have a soda tax) "could still be a problem under sub-standard (a) or (b) . . . because the notion of the soda tax and everything that surrounds it is being debated in the public." *Id.* Benedetti testified that he gives commercial and non-commercial advertisements the same treatment. That testimony is supported by the fact that the 2015 Advertising Standards do not draw such a distinction. The District Court nonetheless found that Benedetti "apparently considers the commercial nature of certain advertisements." *Id.* at 579–80.

Benedetti also failed to provide clear testimony about the definition of the phrase "political in nature," which appears

16

in the political provision.  He testified that mentioning a law or regulation could be considered political in nature, but he also testified that an advertisement could be political in nature without "directly or indirectly implicating the action, inaction, prospective action or policies of a government entity."  *Id.* at 580.

During trial, the District Court also considered several additional advertisements that CIR submitted as exhibits to illustrate SEPTA's allegedly discriminatory application of its advertising restrictions.  These advertisements included examples of both accepted and rejected applications.  The District Court described each of these exhibits in its decision.  *See id.* at 581–83.

Rejected advertisements include the following: (1) an advertisement stating "Dear Art Museum: Art is Expensive! So is constructing new buildings!  We totally get why you can't pay all your employees a living wage!"; and (2) an advertisement from Bethany Christian Services saying, "Unplanned Pregnancy?  Now what?  Consider adoption as an option.  You don't have to make your decision alone."  *Id.* at 581.  Benedetti testified that these advertisements were rejected because they involved the issue of a living wage and abortion, respectively, both of which he considered to be matters of public debate.  *Id.* at 581 nn.3–4.  Other rejected advertisements included one from the U.S. Department of Homeland Security, which announced, "Sex trafficking, Forced labor, Domestic Servitude.  It's happening in our community.  Get informed."  *Id.* at 581.  Benedetti could not explain why this advertisement was rejected, and SEPTA did not offer other evidence to shed light on this action.

Accepted advertisements include the following: (1) an advertisement from the Philadelphia Host Committee that stated "Welcome [Democratic National Committee]. We are Philadelphia's: Union Middle Class Jobs, office cleaners, community, neighbors, building service workers, window washers, security officers, families, school district workers. Road out of poverty"; (2) an advertisement for an event at the African American Museum that featured pictures of Martin Luther King, Jr., Cesar Chavez, and Lucretia Mott and posed, among other things, the question: "What will you do for Peace?"; and (3) a Facebook advertisement stating: "Fake news is not your friend," "Data misuse is not your friend," "Clickbait is not your friend," "Fake accounts are not your friends." *Id.* at 582–83.

Benedetti testified that the Philadelphia Host Committee advertisement may not actually comply with the 2015 Advertising Standards. *Id.* at 582 n.13. He further testified that the Peace advertisement did not violate the policy because it did not "tak[e] a position or ask[] for action." *Id.* at 583 n.14.

Other pertinent, accepted advertisements include those from banks regarding home loans. Several of these advertisements bear Equal Housing Lender and/or Member FDIC logos. *Id.* at 584. Relatedly, CIR identified an advertisement from the Housing Equality Center which stated, "Housing discrimination is illegal. Housing Equality Center can help you understand your rights." *Id.* Benedetti, however, could not recall whether SEPTA accepted that advertisement.

After trial, the parties submitted proposed findings of fact and conclusions of law, and the Court heard oral argument.

**E.     District Court Decision**

On November 28, 2018, the District Court issued Findings of Fact and Conclusions of Law holding that portions of the Challenged Provisions were incapable of reasoned application.  The District Court, however, struck problematic portions from the 2015 Advertising Standards and ordered SEPTA to revise the policy consistent with the District Court's decision.[2]  The District Court then found that with the overly

---

[2] As revised by the District Court, the Challenged Provisions read:

> (a)     Advertisements promoting or opposing a political party, or promoting or opposing the election of any candidate or group of candidates for federal, state, judicial or local government offices are prohibited.  In addition, advertisements that ~~are political in nature or~~ contain political messages, including advertisements involving political or judicial figures ~~and/or advertisements involving an issue that is political in nature in that it directly or indirectly implicates the action, inaction, prospective action or policies of a government entity~~.

> (b)     Advertisements expressing or advocating an opinion, position or viewpoint on ~~matters of public debate about~~ economic, political, religious, historical or social issues.

*Id.* 604–05.

19

broad language removed, CIR's viewpoint discrimination challenges, both facial and as-applied, fail. The District Court's decision can be grouped into four principal parts.

First, the District Court determined that the relevant forum was the inside of SEPTA buses and that SEPTA had sufficiently "closed the forum to public speech and debate." *Id.* at 602.

Second, having found that the relevant forum was nonpublic, the District Court then evaluated whether the Challenged Provisions of the 2015 Advertising Standards were capable of reasoned application. Applying the Supreme Court's decision in *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), the District Court found portions of both the political and public debate provisions to be "too broad to pass constitutional muster under *Mansky*." *Ctr. for Investigative Reporting*, 337 F. Supp. 3d at 604. Instead of invalidating the Challenged Provisions in their entirety, however, the District Court excised portions of them. In addition to amending the Challenged Provisions, the Court directed SEPTA to adopt a meet-and-confer program under which it would discuss with advertisers proposed advertisements that SEPTA deems violative of its standards. *Id.* at 605.

Third, the District Court applied the two-step test articulated by this Circuit in *NAACP v. City of Philadelphia*, 834 F.3d 435 (3d Cir. 2016) and held that SEPTA's Advertising Standards, "with the stricken language removed, . . . are now facially valid, reasonable, and constitutional." *Ctr. for Investigative Reporting*, 337 F. Supp. 3d at 612.

Fourth, the District Court found that the Challenged Provisions, as amended by the District Court, were viewpoint neutral on their face and as applied to CIR. *Id.* at 615–18.

## II.    JURISDICTION AND STANDARD OF REVIEW

The District Court had jurisdiction under 28 U.S.C. § 1331. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

"We review a district court's legal conclusions de novo, and ordinarily review its factual findings for clear error." *Pittsburgh League of Young Voters Educ. Fund v. Port Authority of Allegheny Cnty.*, 653 F.3d 290, 295 (3d Cir. 2011). Because this case implicates the First Amendment, however, we "make an independent examination of the whole record." *Bose Corp. v. Consumers Union*, 466 U.S. 485, 499 (1984). Nonetheless, we defer to the District Court to the extent its factual findings "concern witness credibility." *Fulton v. City of Philadelphia*, 922 F.3d 140, 152 (3d Cir. 2019); *Bose*, 466 U.S. at 499, 510–11.

## III.    DISCUSSION

CIR makes two arguments why the Challenged Provisions of the Advertising Standards, as revised by the District Court, are unconstitutional: (1) they discriminate based on viewpoint as applied to CIR and (2) they impose an impermissible restriction on speech given the public nature of the forum.[3] Although these arguments implicate several First

---

[3] At oral argument, counsel for CIR conceded that on appeal CIR was not making a facial viewpoint challenge to the Challenged Provisions, as it had below. Counsel for CIR also

21

Amendment doctrines, we need only address whether the Challenged Provisions are capable of reasoned application. Because we hold that they are not, we will reverse and remand the case back to the District Court for further proceedings consistent with this decision.

## A.    Applicable Law

The First Amendment prohibits two forms of content-based discrimination, subject matter discrimination and viewpoint discrimination, which is especially egregious. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828–29 (1995) ("Discrimination against speech because of its message is presumed to be unconstitutional."). Subject matter restrictions may be permissible depending on the nature of the forum to which the speaker seeks access. *Id.* In those cases, "[t]he State may not exclude speech where its [restriction] is not 'reasonable in light of the purpose served by the forum.'" *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 804–06 (1985)). In contrast, viewpoint restrictions are impermissible in any forum. *Id.*

CIR brings both a facial and as-applied challenge to SEPTA's current Advertising Standards. CIR's facial challenge is that the current Advertising Standards constitute an impermissible subject matter restriction. Its as-applied challenge is that the current Advertising Standards discriminate against CIR's viewpoint. Because we hold, for

noted that it is challenging *how* the District Court revised the Advertising Standards, not the fact that it revised them.

the reasons set out below, that the current Advertising Standards are an impermissible subject matter restriction on speech, we need not "pause to consider whether [the provision] might admit some permissible applications." *Iancu v. Brunetti*, 139 S. Ct. 2294, 2302 (2019).

In our recent decision *Northeastern Pennsylvania Freethought Society v. County of Lackawanna Transit System*, we explained that district courts must address whether a particular restriction is a viewpoint or subject matter restriction before conducting the forum analysis. 938 F.3d 424, 431–32 (3d Cir. 2019). That is "because the type of forum sheds no light on whether a policy or decision discriminates against a certain viewpoint. And viewpoint discrimination is impermissible in any forum." *Id.* (citations omitted).

*Freethought*, however, differs from this case in one important respect. The Supreme Court's recent case *Mansky*, which held that content-based restrictions on speech in nonpublic fora are unconstitutional if they are incapable of reasoned application, squarely resolves the issues in this case. 138 S. Ct. at 1892.

*Mansky* sets a baseline requirement that all forms of content-based restrictions must be capable of reasoned application. In other words, even if the content-based restriction is one that merely restricts certain subjects, as opposed to certain viewpoints, it must at the very least be capable of reasoned application. *Freethought* did not foreclose the possibility that we might find a government restriction on speech, at the threshold, to be incapable of reasoned application and therefore impermissible in any forum. Indeed, such a finding would avoid wading into First Amendment issues that need not be resolved to dispose of a case.

23

Accordingly, we are not required to decide in the first instance whether the policy here is based on viewpoint or subject matter, just as we are not required initially to decide whether the forum at issue is public or nonpublic. At a minimum, SEPTA's restrictions on speech must be capable of reasoned application.[4] *See NAACP*, 834 F.3d at 449 ("No matter the type

---

[4] In the context of other content-based restrictions on speech, such as gag orders, at least one other circuit has opined that the condition that restraints on speech be capable of reasoned application is a core one and is capable of being resolved before determining whether a restriction is based on viewpoint or subject matter. *See In re Murphy-Brown, LLC*, 907 F.3d 788, 800 (4th Cir. 2018) (holding that a gag order, which petitioner argued discriminated based on viewpoint, was unconstitutionally vague, and therefore incapable of reasoned application, because "it forced individuals to 'guess at its contours'"). In *In re Murphy-Brown*, the Fourth Circuit helpfully explained:

> [t]his core requirement of clarity avoids twin problems. For one, "[t]he interpretive process itself would create an inevitable, pervasive, and serious risk of chilling protected speech pending the drawing of fine distinctions that, in the end, would themselves be questionable." Vague restraints also pose the risk of discriminatory or arbitrary enforcement.

*Id.* (citing *Citizens United v. FEC*, 558 U.S. at 327 & *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1051 (1991)).

24

of forum, restrictions on speech on government property must be reasonable.").  For the following reasons, we find that they are not, and we conclude our First Amendment inquiry there.

## B.    Analysis

The question at the heart of this appeal therefore is whether the current Advertising Standards, either in their original form or as revised by the District Court, are capable of reasoned application.  Assuming without deciding that the restrictions at issue are content-based and that the relevant forum is nonpublic, the current Advertising Standards only need to be "reasonable."  *Eichenlaub v. Twp. of Ind.*, 385 F.3d 274, 279 (3d Cir. 2004).  In this context, "reasonable" means that they must be "designed to confine the 'forum to the limited and legitimate purposes for which it was created.'"  *Id.* (quoting *Rosenberger*, 515 U.S. at 829).  The government actor bears the burden of "tying the limitation on speech to the forum's purpose."  *NAACP*, 834 F.3d at 445.

SEPTA sells advertisements to "raise revenue . . . in a manner that provides for the safety, efficiency[,] and comfort of [its] passengers."  App. 1083.  Accordingly, we will discuss whether the current Advertising Standards are capable of reasoned application given these goals.  Before discussing SEPTA's arguments detailing why the current Advertising Standards satisfy this requirement, a discussion of *Mansky*, which we find controlling here, is necessary.

*Mansky* involved a challenge to a Minnesota law that prohibited individuals from making certain statements inside or near a polling location.  The specific provision at issue prohibited individuals from wearing a "political badge, political button, or other political insignia . . . at or about the

polling place." *Mansky*, 138 S. Ct. at 1883. There, the Court held first that a polling place in Minnesota qualifies as a nonpublic forum. *Id.* at 1886. Because the provision did not "discriminate[] on the basis of viewpoint on its face," the question before the Court was whether the political apparel ban was "reasonable in light of the purpose served by the forum." *Id.* (citation omitted). The Court found that the interest of protecting voters at the polling location from messages that would distract them from "the important decisions immediately at hand" was sufficient to permit Minnesota to "choose to prohibit certain apparel . . . because of the message it conveys." *Id.* at 1888. The Court held, however, that the term "political," which was not defined in the statute and which had been interpreted in various ways in the State's official guidance documents, was not "capable of reasoned application." *Id.* at 1892.

In deciding that the term "political" as used in the Minnesota statute was unconstitutional, the *Mansky* Court considered several factors that are relevant here: whether the terms are "indeterminate," such as by being left undefined in the statute or government policy at issue, and whether they have been or are susceptible to "erratic application." *Mansky*, 138 S. Ct. at 1889, 1890. According to *Mansky*, a prohibition on speech is unreasonable if it fails to "articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888.

CIR contends that the District Court, in attempting to cure the constitutional deficiencies in the 2015 Advertising Standards, erred in finding that the revised policy was capable of reasoned application. That is so, CIR argues, because the current Advertising Standards continue to prohibit advertisements that "contain political messages" and those that

26

address "political . . . issues." Appellant Br. 49. According to CIR, both phrases pose the same First Amendment problems as the portions of the 2015 Advertising Standards that the District Court had already found unconstitutional under *Mansky*.

SEPTA disagrees and argues that the restrictions at issue here differ from those in *Mansky*. Because of those differences, SEPTA contends, we should hold that the current Advertising Standards are capable of reasoned application and uphold the decision of the District Court. As a threshold matter, SEPTA questions CIR's broad reading of *Manksy* because of the Supreme Court's earlier plurality decision in *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), in which the Court upheld a prohibition on political advertisements on city buses. SEPTA argues that the continued vitality of *Lehman*, which the Supreme Court cites favorably in *Mansky*, *see* 138 S. Ct. at 1885–86, means that not all bans on political advertisements are unconstitutional.

SEPTA attempts to distinguish the current Advertising Standards from the political apparel ban in *Manksy* in three ways. First, *Mansky* presented, according to the Supreme Court, "a particularly difficult reconciliation: the accommodation of the right to engage in political discourse with the right to vote." *Id.* at 1892 (quoting *Burson v. Freeman*, 504 U.S. 191, 198 (1992)). Second, SEPTA argues that the ban in *Mansky* was especially problematic because Minnesota had "issued contradictory implementing guidelines." Appellee Br. 48. Here, in contrast, SEPTA represents that it has not issued any such guidelines. Third, the Minnesota law empowered temporary government employees (*i.e.*, county election judges) to make quick decisions about what may or may not be a political issue. Here, again, SEPTA

contends that its practices are far more robust: SEPTA does not impose a pressing deadline, and it requires its General Counsel, and sometimes other lawyers, to determine whether an advertisement falls within a prohibition.

SEPTA's arguments, while forceful, are ultimately unpersuasive. Although the Supreme Court explicitly stated that its holding in *Mansky* did not "set the outer limit of what a State may proscribe," 138 S. Ct. at 1891, it did not limit its holding to polling locations. More to the point, SEPTA does not challenge the District Court's holding that portions of the Challenged Provisions were overbroad, but it fails to offer any reason why the lingering references to advertisements that "contain political messages" and those that address "political issues" are any more capable of reasoned application than those that were struck down. This is an especially important question given that the District Court broadened the public debate provision by eliminating the limiting phrase "matters of public debate about."

In addition, when asked during oral argument whether SEPTA would determine a series of hypothetical advertisements to be in violation of the current Advertising Standards, SEPTA's counsel's answers further highlighted the arbitrariness of the decision-making process. For example, when we asked whether an advertisement that depicted three girls of different races holding hands with a message that says, "This is how racism ends," would be political, counsel for SEPTA responded "no, I don't think so." Oral Argument at 23:33–24:04, *Ctr. for Investigative Reporting v. SEPTA* (No. 19-1170), https://www2.ca3.uscourts.gov/oralargument/audio/19-1170CenterforInvestigativeReportingvSEPTA.mp3. When the Court adjusted the hypothetical to include the same picture with a message that says, "This is what America looks

28

like," counsel for SEPTA responded by asking, "Who's putting the ad on?" *Id.* at 24:13–24:21. That response highlights the extent to which the current Advertising Standards are susceptible to erratic application.

As the *Mansky* Court explained, while the First Amendment does not require "[p]erfect clarity and precise guidance," when the "restriction[s] go beyond close calls on borderline or fanciful cases . . . [,] that is a serious matter when the whole point of the exercise is to prohibit the expression of political views." *Id.* at 1891 (citation omitted). A policy as ill-defined as SEPTA's carries "[t]he opportunity for abuse, especially where [it] has received a virtually open-ended interpretation." *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (citation omitted) (first alteration in original) (second alteration added).

Moreover, far from helping SEPTA's case, the absence of guidelines cabining SEPTA's General Counsel's discretion in determining what constitutes a political advertisement actually suggests that, like the Minnesota statute in *Mansky*, the lack of "objective, workable standards" may allow SEPTA's General Counsel's "own politics [to] shape his views on what counts as 'political.'" *Mansky*, 138 S. Ct. at 1891. That was precisely the problem at the heart of *Mansky* and nothing in the District Court's revision of the 2015 Advertising Standards helps to ameliorate that concern here. In fact, in its post-trial brief, SEPTA conceded that it should have rejected a union advertisement supporting the DNC. SEPTA also accepted an advertisement that included a Black youth wearing a t-shirt that says "My Life Matters." Although such a statement arguably should not be "political," the phrasing "My Life Matters" clearly alludes to the Black Lives Matter movement, which campaigns against violence aimed at Black

people and which has become a lightning rod in the media. To many, such an advertisement would clearly be prohibited under the Advertising Standards, even as revised by the District Court. Yet Benedetti determined that it was not.

To be sure, one or two inconsistencies hardly proves that SEPTA has arbitrarily applied its Advertising Standards, but the lack of structure and clear policies governing the decision-making process creates a real risk that it may be arbitrarily applied. And CIR has amply demonstrated that at least on a few occasions that risk has become a reality. Accordingly, we reverse the District Court's holding that the current Advertising Standards are capable of reasoned application.

## C.    Remedy

Having decided that the Challenged Provisions are unconstitutional, we must now determine the appropriate remedy. CIR contends that the District Court should have entered final judgment completely in its favor and directed SEPTA to run its advertisement. For the following reasons, we find that the District Court erred in failing to order SEPTA to run CIR's proposed advertisements. We will therefore reverse the District Court's judgment and remand the case for entry of judgment in favor of CIR.[5]

Because CIR prevails on the merits, it must also show that "it is entitled to a permanent injunction as a matter of

---

[5] SEPTA, of course, is free to revise its Advertising Standards again to cabin the decisionmaker's discretion in applying the ban on "political" advertisements.

30

discretion." *Ne. Pa. Freethought Soc'y*, 938 F.3d at 442 (citing *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *eBay Inc. v. MercExchange*, LLC, 547 U.S. 388, 391 (2006)). To do so, CIR "must show that (1) it has suffered irreparable injury; (2) there is no adequate remedy at law; (3) the balance of hardships tips in its favor; and (4) granting an injunction would not be against the public interest." *Id.* (citation omitted).

Here, each of these elements is satisfied. First, CIR's advertisement has already been rejected once under the 2015 Advertising Standards. As discussed above, the current Advertising Standards reflect only the modest revisions imposed by the District Court, which fail to cure their constitutional deficiencies. Second, and relatedly, no remedy at law can cure CIR's First Amendment injury because "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The only way for CIR to get complete relief is for the District Court to order SEPTA to run the advertisement. Third, the only hardship to SEPTA is the burden of redrafting the political and public debate provisions of its current Advertising Standards, if it chooses to do so. In contrast, the hardship to CIR is considerable in that the current Advertising Standards impermissibly deprive it of its, and other potential speakers', constitutional rights to engage in free speech. Fourth, and finally, the public interest does not suffer by enforcing the First Amendment's protection against restrictions on speech that are incapable of reasoned application.

\* \* \* \* \*

The Challenged Provisions of the current Advertising Standards are incapable of reasoned application. Accordingly, we will reverse the judgment of the District Court and instruct it to grant declaratory relief and issue an injunction barring enforcement of the Challenged Provisions of the current Advertising Standards against CIR.