J-A25006-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| v. | : | |
| | : | |
| CHRISTIAN BEY | : | |
| | : | |
| v. | : | |
| | : | |
| PG PUBLISHING COMPANY D/B/A | : | |
| THE PITTSBURGH POST-GAZETTE, | : | |
| | : | |
| Intervenor | : | |
| | : | |
| APPEAL OF:  PG PUBLISHING | : | |
| COMPANY D/B/A THE PITTSBURGH | : | |
| POST-GAZETTE | : | No. 51 WDA 2020 |

Appeal from the Order Entered December 12, 2019,
in the Court of Common Pleas of Allegheny County,
Criminal Division at No(s):  CP-02-CR-0007905-2019.

BEFORE:   KUNSELMAN, J., KING, J., and COLINS, J.[*]

MEMORANDUM BY KUNSELMAN, J.:               **FILED:  March 14, 2022**

In this capital-murder case, the Intervenor/Appellant, The PG Publishing Company (d.b.a. *The Pittsburgh Post-Gazette*, "the Press"), challenges a gag order barring witnesses and potential witnesses of either party from speaking publicly or posting on social media about this case.  Because the order does not curtail any of the Press's constitutional or common-law rights, we affirm.

On July 14, 2019, Pittsburgh Police Officer Calvin Hill died of gunshot wounds.  The next day, the supervising judge of the Allegheny County grand

---

[*] Retired Senior Judge assigned to the Superior Court.

jury found probable cause to believe that witness intimidation occurred, was occurring, or was likely to occur. Therefore, she ordered that this matter be brought before the grand jury, which indicted Mr. Bey for homicide and firearm offenses.[1]

The Commonwealth announced its intent to seek the death penalty, and the supervising judge sealed the court record. Next, the Press intervened and moved to unseal the record. The judge initially denied its motion, but, two weeks later, she vacated the order sealing the record. The case was then assigned to a different judge for trial.

In September of 2019, the Commonwealth moved to limit extrajudicial statements by the attorneys, witnesses, potential witnesses, and others until the conclusion of the jury trial. Mr. Bey consented to the motion.

Thus, the trial court issued an order prohibiting out-of-court statements that the speaker "knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding." T.C.O., 9/18/19. The order applied to Mr. Bey, all attorneys, investigators, court personnel, and any "person who has been called as a witness or has been advised by any party that he or she is likely to be called as a witness, or reasonably believes that he or she is likely to be called as a witness, in any proceeding in this matter." *Id.*, ¶4. The Press moved to amend the gag order by asking the court to

---

[1] *See* 18 Pa.C.S.A. §§ 2501(a), 6105(a)(1), 6106(a).

vacate the portion gagging witnesses (Paragraph 4). The Commonwealth and Mr. Bey opposed the Press's motion. They contended, among other things, that the request would endanger witnesses, bias potential jurors, and violate Mr. Bey's constitutional right to a fair trial in Allegheny County.

Following a hearing on the motion, the trial court declined to vacate Paragraph 4 of its order. The court ruled that doing so would seriously harm Mr. Bey's right to a fair trial before impartial, Allegheny County jurors and jeopardize the lives of the witnesses. This timely appeal followed.

The Press raises two issues on the merits of the order.[2] They are:

1.    Does Paragraph 4 of the trial court's gag order impermissibly infringe upon First Amendment rights under the Constitution of the United States, rights under the Constitution of the Commonwealth of Pennsylvania, or the common-law right of access?

2.    Is Paragraph 4 of the trial court's gag order incapable of reasoned application and/or constitutionally vague or overbroad?

The Press's Brief at 3.

*1.    The Press's Alleged Constitutional and Common-Law Rights*

First, the Press raises issues of federal and state constitutional law, as well as the common-law right of access to the courts. The Press claims the gag order "impermissibly infringes upon multiple constitutional and common-law rights of [it] and others." *Id.* at 18. However, the Press does not establish

---

[2] The Press raises a third issue regarding potential mootness. We need not address that issue, because the gag order remains in effect.

which of its alleged, fundamental rights the gag order supposedly violates. Indeed, the Press concedes the "the gag order does not limit [its] publication of information . . . ." *Id.* n.7. Rather, the Press suggests the order restricts its "ability to obtain and publish information from witnesses, which represents a *de facto* restraint on its ability to publish." *Id.* However, the Press does not cite any appellate authority to support the contention that receiving answers from interviewees is a fundamental right under the First Amendment to the Constitution of the United States; Article I, §§ 7 and 11 of the Constitution of the Commonwealth of Pennsylvania; or at common law.[3]

---

[3] The First Amendment dictates, "Congress shall make no law respecting an establishment of religion; or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const. amnd. 1.

The Constitution of the Commonwealth of Pennsylvania provides, in relevant part:

> The printing press shall be free to every person who may undertake to examine the proceedings of the Legislature or any branch of government, and no law shall ever be made to restrain the right thereof. The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty. No conviction shall be had in any prosecution for the publication of papers relating to the official conduct of officers or men in public capacity, or to any other matter proper for public investigation or information, where the fact that such publication was not maliciously or negligently made shall be established to the satisfaction of the jury; and in all indictments for libels the

Based on the Press's unsubstantiated premise that the gag order violates its fundamental rights, the Press asserts the order "is subject to strict scrutiny, which requires the government to prove that the restrictions are narrowly tailored to serve a compelling state interest." *Id.* at 19. The Press bases its request that we apply the strict-scrutiny test on its belief that the order is content-based. It claims the trial court must review the content of what the witnesses or potential witnesses say outside of the courtroom or post online to determine whether a violation of the order occurred. On the other hand, if the order is content-neutral, the Press argues for the intermediate-scrutiny test, wherein the order "still must be narrowly tailored to serve a significant governmental interest." *Id.* at 21. The Press does not contend that the order fails the rational-basis test under the Fourteenth Amendment.

Alternatively, the Press asks us to extend the common-law right of access to court records and to attend court proceedings so that the right will

---

> jury shall have the right to determine the law and the facts, under the direction of the court, as in other cases.

Pa. Const. art. I, § 7. Furthermore:

> All courts shall be open; and every man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law, and right and justice administered without sale, denial or delay. Suits may be brought against the Commonwealth in such manner, in such courts and in such cases as the Legislature may by law direct.

Pa. Const. art. I, § 11.

include a right to speak to witnesses or potential witnesses prior to trial. The Press cites no authority to support an extension of the common law, but it claims, "Historically, the Press has never been denied access . . . to potential witnesses, and logically, [its] right to speak with any individual is enshrined in the First Amendment." *Id.* at 33-34.

We address each theory in turn.

Because the Press "challenge[s] the gag order on the ground that it violates [its fundamental rights] as guaranteed by the state and federal constitutions, [it] presents questions of law for which our standard of review is *de novo*, and our scope of review is plenary." *S.B. v. S.S.*, 243 A.3d 90, 104 (Pa. 2020), cert. *denied*, ___ U.S. ___, 142 S. Ct. 313, (2021) (citing *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1038, (1991) ("an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression")).

Also, when a party challenges the constitutionality of a gag order under both constitutions, "the protections afforded by the First Amendment and Article I, § 7 are coextensive . . . ." *Id.* at 113. Thus, our analysis of the Press's rights under the First and Fourteenth Amendments simultaneously disposes of its theory under the state charter.

Pursuant to the Due Process Clause of the Fourteenth Amendment, "No state shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amnd. XIV, § 1.

Interpreting the Due Process Clause, the Supreme Court of the United States has said, "some of the personal rights safeguarded by the [Bill of Rights] against national action may also be safeguarded against state action, because a denial of them would be a denial of due process of law." *Twining v. New Jersey*, 211 U.S. 78, 99, (1908), *overruled on other grounds*, *Malloy v. Hogan*, 378 U.S. 1 (1964). This is known as incorporation of the Bill of Rights against the States. Incorporation occurs "not because those rights are enumerated in the [Bill of Rights], but because they are of such a nature that they are included in the conception of due process of law." *Id.* at 99–100. It is settled law that the "Due Process Clause . . . now protects . . . the rights of speech, press, and religion covered by the First Amendment . . . ." *Duncan v. Louisiana*, 391 U.S. 145, 148, (1968).

Hence, by opposing the sovereign power of Pennsylvania's judiciary to enter a gag order based on the First Amendment, the Press actually asserts a violation of the Fourteenth Amendment. We therefore review the Press's constitutional challenge to the order through the prism of a substantive-due-process claim under the Fourteenth Amendment. Seen in this light, the instant appeal is procedurally distinct from the cases that the Press cites in its brief.[4]

---

[4] *See, e.g., Philadelphia Press v. Jerome*, 387 A.2d 425 (Pa. 1978) (press asserted *its* First Amendment right to attend pretrial hearings to suppress evidence in criminal matters); *Commonwealth v. Genovese*, 487 A.2d 364 (Pa. Super. 1985) (press asserted *its* Frist Amendment right to publish information in its possession); *Gentile*, *supra* (attorney asserted *his* First Amendment right to hold a press conference about an upcoming case, despite

Unlike the litigants in those cases, the Press does not establish that the order violates a fundamental right belonging to the Press, itself.

The cases in the Press's brief reviewed state actions using the strict-scrutiny or intermediate-scrutiny test, because those state actions directly infringed upon the appellants' rights, rather than the rights of third parties. Because the appellants asserted their own First Amendment freedoms, they were challenging state action based upon their own rights, as incorporated in **Gitlow v. New York**, 268 U.S. 258 (1925). Therefore, strict or intermediate scrutiny of the state action was necessary to ensure that the challenged state action did not unconstitutionally curb those appellants' fundamental rights in contravention of the Due Process Clause of the Fourteenth Amendment.

Unlike the cases upon which the Press relies, here, the Press has not clearly established which of its fundamental rights the gag order allegedly

---

disciplinary sanctions under Rules of Professional Conduct); **Commonwealth v. Lambert**, 723 A.2d 684 (Pa. Super. 1998) (same); **McCullen v. Coakley**, 573 U.S. 464 (2014) (anti-abortion "sidewalk counselors" asserted **_their_** First Amendment right to speak with women near the entrances of abortion clinics); **Minnesota Voters Alliance v. Mansky**, ___ U.S. ___, 138 S.Ct. 1876 (2018) (voters asserted **_their_** First Amendment right to wear political shirts and buttons inside polling places); **In Re: Murphy-Brown, LLC**, 907 F.3d 788 (4th Cir. 2018) (civil defedants asserted **_their_** First Amendment right to speak publicly about class-action suits); **In Re: 2014 Allegheny County Investigative Grand Jury**, 223 A.3d 214 (Pa. 2019) (press asserted **_its_** First Amendment right to access judicial records); **Center for Investigative Reporting v. Southeastern Pennsylvania Transportation Authority**, 975 F.3d 300 (3rd Cir. 2020) (plaintiff asserted **_its_** First Amendment right to publish advertisements of political content on the SEPTA buses and trains); and **S.B.**, **supra** (litigant and attorney asserted **_their_** First Amendment right to publish information regarding custody cases online and to speak publicly about it).

infringes. In fact, on its face, Paragraph 4 of the gag order does not even apply to the Press, because the Press is not a witness or potential witness in Mr. Bey's upcoming court proceedings.

Paragraph 4 prevents only the witnesses and potential witnesses in this case from speaking publicly about the case prior to the jury trial. This order may have the collateral consequence of preventing the Press from getting information from those witness or potential witnesses. On the other hand, it may not. The Press did not call anyone to testify at the trial court's hearing to prove that any witness or potential witness wants to speak with the Press or wishes to be exposed to publicity due to the individual's role as a witness. Thus, any impact this gag order has upon the Press's ability to write or publish stories on this case, prior to the jury trial, is mere conjecture.[5]

---

[5] In fact, the appealed-from order does not aggrieve the Press. As a result, it lacks standing to appeal. **See** Pa.R.A.P. 501 (granting appellate rights to "any party who is aggrieved by an appealable order" and stating that "Whether or not a party is aggrieved by the action below is a substantive question determined by the effect of the action on **the party**") (emphasis added).

In **Commonwealth v. Crawford**, 789 A.2d 266 (Pa. Super. 2001), which involved a similar order, we concluded a newspaper lacked standing, because it had not been allowed to intervene, the newspaper was not specifically named in the gag order, and there was no alternate source of standing under the traditional standing test. We rooted our holding in the fact that the newspaper did not have a substantial and direct interest in the gag order beyond that of the general public. **See id.** at 269.

The instant appeal is virtually identical to **Crawford**, except that, here, the Press was granted status as intervenor. **Cf. id.** at 269 n.3 (stating that this Court "need not determine whether intervenor status automatically bestows standing upon the intervenor to appeal a disputed lower court

It is telling that no witnesses or potential witnesses challenged the gag order as violating ***their*** rights under the First Amendment or Article I, § 7. Thus, whether the gag order violated a witness's or a potential witness's freedom of speech under the two constitutions is not before this Court. And the Press does not contend that the gag order restricts ***its*** freedom of speech, nor could it successfully advance such a contention. The Press remains free to say whatever it wishes about this case.

Furthermore, the gag order does not implicate the freedom of the Press. The order does not prevent the Press from reviewing the court records of this matter or publishing any information, documents, or quotes that the Press possesses. Also, the order does not stop the Press from speaking with or

_____

order"). Nevertheless, the trial court's grant of intervenor status does not confer standing on the Press to assert the First Amendment rights of the third-party witnesses, particularly in light of the fact that it asserts its own common-law, news-gathering right in parallel with the First Amendment claim.

That said, when this panel questioned the Press's standing during oral argument, all parties agreed that neither the Commonwealth nor Mr. Bey objected to the Press's motion on the basis of standing. The Supreme Court of Pennsylvania has held that trial courts may not raise the issue of standing *sua sponte*. **See**, **e.g.**, **Commonwealth v. Koehler**, 229 A.3d 915, 940 (Pa. 2020). Be that as it may, the rule prohibiting trial courts from raising standing *sua sponte* does not apply in this appeal, because we may affirm an order on any grounds appearing of record, and the rule that failure to raise an issue below waives it on appeal only applies to appellants, not to appellees. **See Discovery Charter School v. School District of Philadelphia**, 166 A.3d 304, 314 n.10 (Pa. 2017).

Under **Crawford**, **supra**, the Press lacks standing to bring this appeal, because the appealed-from order does not aggrieve the Press any more than it aggrieves the public-at-large. Hence, we also affirm the trial court's order on the alternative grounds that the Press lacks standing to appeal.

interviewing anyone involved in the case or printing anything the Press might learn from those discussions (or from any source, including anonymous ones). Finally, the order does not prevent the Press from attending the proceedings in this case, reporting on those proceedings, or editorializing on them. Indeed, the order does not direct the Press to do or to refrain from doing anything.

Construing a similar gag order that prohibited a mother and her attorney from naming her child publicly and from publishing about a custody case on the Internet, the Supreme Court of Pennsylvania said, "The trial court did not seal the record of the [case] nor impose any prior restraints upon the press that precluded **the dissemination of information** relating to the custody trial." **S.B.**, 243 A.3d at 111 (emphasis added). "[L]imiting the speech of trial participants is a less restrictive alternative than imposing a prior restraint on the press itself." **Id.** (citing **Sheppard v. Maxwell**, 384 U.S. 333, 361 (1966)). Like the gag order in **S.B.**, the gag order at bar has not precluded the Press from disseminating any information about Mr. Bey's impending trial.

Under Pennsylvania case law, a gag order against participants in an ongoing court proceeding is not viewed as a restraint upon the freedom of the Press for either federal or state constitutional purposes. Thus, we conclude that the gag order did not infringe upon any fundamental right of the Press.

Accordingly, neither the strict-scrutiny nor the intermediate-scrutiny tests of constitutional review apply to the Press's due-process claim. Instead, where, as here, the state action "neither proceeds along suspect lines nor infringes fundamental constitutional rights" of the challenging party, the state

action is constitutional "if there is any reasonably conceivable state of facts that could provide a rational basis for" the state actor's decision. *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, (1993). This is the rational-basis standard of constitutional review. To survive under that standard, the gag order need only be "rationally related to legitimate government interests." *Box v. Planned Parenthood of Indiana & Kentucky, Inc.*, ___ U.S. ___, ___, 139 S. Ct. 1780, 1782, (2019).

As mentioned, the Press argues that the gag order fails to satisfy the strict-scrutiny and intermediate-scrutiny tests. It never argues that the order is not "rationally related to legitimate government interests." *Id.* As such, we need not review this issue further, because the Press had not developed a constitutional argument in that vein.

Turning to the Press's claim under the common-law right of access, the Press did not cite any authority to support expansion of the common-law right to prohibit pretrial, gag orders of witnesses and potential witnesses. The Press fails to convince this Court to revamp the common law. Moreover, such a request is best directed to the Supreme Court of Pennsylvania.

In short, because the Press has not established that the gag order abridges *its* rights, its first claim of error is meritless.

2.  *Claims of Vagueness and Overbreadth*

In its second issue, the Press claims Paragraph 4 of the gag order is vague and overly broad in violation of the Due Process Clause. The Press

asserts that readers of the gag order cannot reasonably know if they are or will be potential witness who must follow its terms.

If government regulations (including gag orders) fail to give a person of ordinary intelligence fair notice that her contemplated conduct is forbidden, the regulation is unconstitutionally vague under the Due Process Clause. ***See Papachristou v. City of Jacksonville***, 405 U.S. 156, 162, (1972). When a regulation "gives adequate warning of what activities it proscribes" and sets forth "explicit standards" for the persons subject to it, the law is constitutional. ***Broadrick v. Oklahoma***, 413 U.S. 601 (1973). A regulation is overly broad when it "prohibits constitutionally protected conduct . . . overbreadth must be substantial." ***Gentile***, 501 U.S. at 1077 (citations omitted).

Here, the Press is not subject to the gag order, because it is neither a witness nor potential witness in this case. If the gag order is unconstitutionally vague or overly broad under the Due Process Clause, that vagueness or overbreadth impacts only witnesses and potential witnesses. None of those individuals has challenged the gag order for unconstitutional vagueness or overbreadth. As such, any possible violation of the Fourteenth Amendment based on vagueness or overbreadth, as applied to those individuals, is not before us in this appeal.

Regarding regulation of the Press, the gag order's scope and restrictions are abundantly clear: the order does ***not*** apply to the Press. Thus, the Press has no concern of being held in contempt of this gag order, regardless of how broadly the trial court may interpret it. The order will never harm the Press's

finances or infringe upon its rights.  As such, the Press need not guess as to the extent of its liability under the order, because the Press will never be held in contempt of it.

As the gag order does not implicate any actions by the Press, the order provides adequate warning as to how much of the Press's conduct it curtails – *i.e.*, none.  The Press's second issue warrants no appellate relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/14/2022